# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

v.                             CRIMINAL ACTION NO. 2:22-cr-00163

DAVID GERALD MINKKINEN
SIVARAMAN SAMBASIVAM,

                Defendants.

### MEMORANDUM OPINION AND ORDER

The Court has reviewed *Defendant Sivaraman Sambasivam's and David Gerald Minkkinen's Joint Motion to Dismiss the Indictment Due to the Government's Pre-Indictment Delay* (Document 149), the *Government's Opposition to Defendants' Motion to Dismiss for Pre-Indictment Delay* (Document 159), *Defendants Sivaraman Sambasivam's and David Minkkinen's Reply in Support of Their Motion to Dismiss for Pre-Indictment Delay* (Document 164), *Defendant David Gerald Minkkinen's Supplemental Briefing Regarding Impact of the Superseding Indictment on Certain Pending Motions and Orders* (Document 216), the *Government's Supplemental Briefing to Address the Impact of the Superseding Indictment as to Defendants' Pretrial Motions* (Document 217), and *Defendant Sivaraman Sambasivam's Supplemental Briefing Regarding Motions Pending Before This Court* (Document 218).   For the reasons stated herein, the Court finds that the Defendants' motion should be granted in part.

## ALLEGATIONS IN THE SUPERSEDING INDICTMENT

The Defendants, Sivaraman Sambasivam and David Gerald Minkkinen, were indicted on August 23, 2022.   A *Superseding Indictment* (Document 186) was returned on May 31, 2023.[1] As to Defendant Sambasivam, the indictment charges that he has violated 18 U.S.C. § 1832(a)(5) (Conspiracy to Steal Trade Secrets), 18 U.S.C. §§ 1343 and 1349 (Conspiracy to Commit Wire Fraud), 18 U.S.C. § 1343 (Wire Fraud), and twice violated 18 U.S.C. § 1001(a)(2) (Making of a False Statement).   As to Defendant David Minkkinen, the indictment charges that he has violated 18 U.S.C. § 1832(a)(5) (Conspiracy to Steal Trade Secrets), 18 U.S.C. §§ 1343 and 1349 (Conspiracy to Commit Wire Fraud), twice violated 18 U.S.C. § 1343 (Wire Fraud), and violated 18 U.S.C. § 1001(a)(2) (Making of a False Statement) seven times.

Generally, the indictment alleges the following:   Deloitte owned and marketed a web-based software platform, Unemployment Framework for Automated Claim & Tax Services (uFACTS).   This software platform was used to process unemployment claims for state agencies. The platform's "source code, database, data tables, use cases, software designs, business rules, schema, logic, artifacts, and architecture constituted Deloitte intellectual property."   (Superseding Indictment ¶ 1.)   This uFACTS platform had been implemented in Minnesota, New Mexico, and Massachusetts.   The Defendants were employed by Deloitte, with Defendant Minkkinen as the Unemployment Insurance Practice Leader and Defendant Sambasivam as the lead system architect for the uFACTS Solution Framework.

---

[1] Although the initial motion to dismiss was filed prior to the superseding indictment, the Court provided the parties the opportunity to submit additional briefing in light of the superseding indictment and will address the motion as applied to the superseding indictment as the now operative pleading.

Between June 2013 and December 2015, eleven employees left Deloitte and began working for Sagitec Solutions, LLC, which also had an Unemployment Insurance practice.   Mr. Minkkinen and Mr. Sambasivam separately left Deloitte and joined Sagitec in 2013.   In their employment contracts with Deloitte, the Defendants agreed to not disclose any of Deloitte's proprietary property to third parties or retain the property.   Defendant Minkkinen also was reminded through a resignation checklist that he was not to copy client or Deloitte information, and he was to return all records that he had checked out and return all "work in progress files." (Superseding Indictment ¶ 8.)

However, pursuant to an agreement between the Defendants, first Defendant Minkkinen, and then Defendant Sambasivam, copied and downloaded several pieces of Deloitte proprietary information, including the uFACTS source code, data, and use cases, without authorization.[2]   For example, between 2013 and 2015, one or both of the Defendants copied or transferred to Sagitec an executive summary of Deloitte's response to a request for proposal, a marketing brochure, Deloitte's uFACTS related fraud detection deliverables for Wisconsin and Minnesota, use case documents from Deloitte's Massachusetts's uFACTS project, the uFACTS Oracle database, the uFACTS Data Definition Language, a 227-page document titled the "uFACTS Solution Framework," and a spreadsheet titled "Deloitte Consulting Project Pricing Model."   The information was mostly transmitted over email, sometimes between the two Defendants, and at other times included other Sagitec employees.   In addition to the information sent by the Defendants, there were emails sent by Sagitec employees to the Defendants, discussing additional

---

[2] More specific instances and examples of the copying and transmission of information from Deloitte are included in the Superseding Indictment ¶¶ 11-31.

information regarding Deloitte's uFACTS software, including the uFACTS code base and use cases.

Until on or about September 20, 2013, Defendant Sambasivam had been employed by Deloitte, but was communicating with Sagitec employees, including Defendant Minkkinen, about the uFACTS software.   While still employed by Deloitte, Defendant Sambasivam emailed both a link and corresponding login information to a Sagitec employee for Deloitte's Massachusetts project.

In or about 2015, Sagitec was awarded a contract to design and develop an unemployment insurance benefit claim software system for the states of Maryland and West Virginia.   The interests of the two states combined into the Maryland-West Virginia Consortium (Consortium). In Sagitec's contract with the Consortium, signed by Defendant Minkkinen, Sagitec agreed that its work product would not infringe on the proprietary rights of a third party.   The money to fund the project was provided by federal grants from the United States Department of Labor.

To complete the project, Sagitec employees worked with state employees from West Virginia and Maryland.   In 2016, West Virginia state employees noticed that there were references to Massachusetts, New Mexico, and Deloitte within the project materials used by Sagitec.   After seeing these references, an employee contacted the West Virginia Commission on Special Investigations.   Upon learning of this complaint, a Maryland Assistant Attorney General (MD AAG) sent a letter to Defendant Minkkinen, raising concerns about the project including references to Massachusetts within Sagitec's documents.   On approximately July 25, 2016, Defendant Minkkinen replied to the MD AAG with a letter drafted with the help of Defendant Sambasivam, which said that references to other states were innocent, and due to Sagitec using

4

them as examples "to discuss potential implementation options" for West Virginia and Maryland. (Superseding Indictment ¶ 34.)   The Defendants made these statements despite their preexisting knowledge and firm belief that Deloitte considered the subject information to constitute trade secrets.

In reply, the MD AAG sent a follow-up letter to Defendant Minkkinen asking, in part, whether any Sagitec employees had "retained . . . any software, source code, data tables, data structures, data dictionaries, documentation, deliverables, or other works" belonging to Deloitte, or had incorporated such items into any work delivered to the Consortium.   (Superseding Indictment ¶ 35.)   In a response to this questionnaire, prepared by both Defendants, signed by Defendant Minkkinen, they denied that any Sagitec personnel had ever retained any of the listed information or had incorporated it into their work for the Consortium.   This position was again stated by Defendant Minkkinen during a November 10, 2016, meeting with officials from Maryland's Department of Labor, Licensing, and Regulation.

Upon learning of a criminal investigation, Defendant Minkkinen sent copies of the response letters, addressed to the MD AAG, to the investigators in West Virginia and Virginia. During later interviews by an investigating agent in Charleston, West Virginia, both Defendants continued to deny any retention or use of Deloitte's proprietary information.

The Defendants have continued to repeatedly deny any improper use of Deloitte's uFACTS software.   For example, Deloitte began accusing Sagitec of theft of trade secrets in 2016. Relying on statements made by the Defendants, Sagitec's counsel denied Deloitte's accusations.[3]

---

3 Deloitte is currently pursuing a civil claim for theft of trade secrets, specifically related to the uFACTS software, against Sagitec.   *Deloitte Consulting LLP et al v. Sagitec Solutions LLC*, 1:23-cv-325 (D. De. 2023).

In response to a later follow-up letter from Deloitte, with the assistance of the Defendants, Sagitec again denied that they had obtained any Deloitte proprietary materials.

## RELEVANT EVIDENCE

Mr. Sambasivam and Mr. Minkkinen both worked for Deloitte between 2009 and 2013, then began working for Sagitec.   At both companies, they had senior roles in the unemployment insurance practice.   Both Defendants worked for BearingPoint/KPMG in similar roles before Deloitte purchased the company's assets in 2009.   They were involved in a project to develop software for an unemployment insurance system for Minnesota between 2003 and 2008.   A similar project with Massachusetts began in 2007, was adopted by Deloitte when it purchased BearingPoint, and was completed in 2014.   Deloitte entered into a similar contract with New Mexico in 2010.

In addition to the Defendants, other Deloitte employees who worked in the unemployment insurance practice left the company for Sagitec.   Bernt Peterson had previously worked on the Minnesota project as a Minnesota state employee.   He then worked on the New Mexico unemployment project for Deloitte.   He joined Sagitec in 2014.   He was identified by investigators in August 2017 as a source of design documents from Deloitte's New Mexico and Massachusetts projects that Sagitec possessed in connection with the Consortium project.   He was interviewed on November 12, 2020.[4]   He died on December 13, 2020.

In the interview, Mr. Peterson described his previous work at Deloitte, including work on both the Massachusetts and New Mexico projects.   (Notes of B. Peterson Interview) (Document

---

4 Although the interview was recorded, the recording has not been submitted, and the Court has relied on the Memorandum of Interview and synopsis attached to the Defendants' motion.   (Documents 149-16 and 149-17.)

149-17.)   After working on those projects, he then went to work at Sagitec, where he worked on the Consortium proposal.   He described the purpose of a use case document: to guide the developers in building the software and to discuss with the client to ensure that the product incorporates the correct rules.   He indicated that he did not recall references to other states while working on the use case documents for the Consortium project.   He recalled having some use case documents on a flash drive when he left Deloitte, likely from the New Mexico project.   He stated that the New Mexico project was developed from the Massachusetts project.   When asked how New Mexico and Massachusetts use case documents appeared in the Consortium files, Mr. Peterson explained that he had reused a template with the header, numbering, and format throughout his career, simply deleting the content and reusing the format.   He stated that projects are sufficiently individualized that taking material from one project to another is of limited utility, though he acknowledged that Sagitec would likely view some use cases it developed as intellectual property.   Mr. Peterson indicated that he did not know whether others, including the Defendants, had taken Deloitte materials when they left, but stated that they had never provided such materials to him.

Philip Tackett was another employee whose name investigators identified in the metadata of Consortium documents that they suspected were taken from Deloitte.   He began working for Sagitec in May 2019 and had worked for Deloitte several years earlier.   He was working for an unrelated company at the time investigators noted that his name was included in the metadata of the Sagitec documents.   Mr. Tackett was interviewed on August 7, 2019.   He died in March 2020.

Mr. Tackett worked on the New Mexico project for Deloitte.   He indicated that, at the end of the project, "the software and all the deliverables, meaning the use cases, the test cases, if there

were training documentation, all those things, they become property of the State." (Tackett Interview Tr. at 7::4-6) (Document 149-21.) Mr. Tackett attributed some similarities between Deloitte and Sagitec materials to David Minkkinen, explaining that he had particular formats and methods that he preferred to use in his projects, which he would have brought from Deloitte to Sagitec. Mr. Tackett also stated that he did not work on many of the documents that included his name as the author in the metadata.

After Sagitec won the Consortium contract in 2015, a Workforce West Virginia employee with some involvement in the project, Greg Keene, became suspicious that, among other things, Sagitec was using stolen intellectual property. In a May 17, 2016 Memorandum, Jim Powers, Deputy Director of CSI, recounted a conversation in which Mr. Keene expressed his concerns with Sagitec's performance on the Consortium contract, including concerns that Sagitec employees may have stolen some of the software from Deloitte.[5] (May 17, 2016 Powers Memo) (Document 149-2.)[6] Mr. Keene provided flash drives with documents related to the project to investigators in June 2016 and continued to provide documents and information as the investigation progressed. Mr. Powers consulted with AUSA Andrew Cogar during the summer of 2016. In a November 2, 2016, call between investigators and Deloitte personnel, a Deloitte representative indicated that Deloitte's previous unemployment insurance projects with states were not in the public domain,

---

[5] The Memo indicates that Mr. Keene claimed there were major problems with the software that could be the result of incompetence, corruption, or both; that "the Sagitec folks are largely Indian;" and that many are former Deloitte employees, and references to Massachusetts caused him concern that the software may have been stolen from Deloitte or Massachusetts. (May 17, 2016 Powers Memo at 1–2.) In a later June 2016 interview, Mr. Keene provided documents he had taken from the Consortium project, and described a litany of concerns, including his view that it was a bad idea for Sagitec to create its own use cases rather than using use cases created by outside business analysts hired by the State of West Virginia, that the lead manager on the project from the State of Maryland was unqualified, that he believed the contract required all work to be performed within the continental US but that Sagitec was not following that requirement, and that Sagitec was in over its head. (June 23, 2016 Powers Memo) (Document 149-4.)
[6] Mr. Powers described Mr. Keene as a CI who had been "reliable (if a little paranoid) in the past." (May 17, 2016 Powers Memo at 1.)

and the states were not permitted to share the software product.[7]  (November 3, 2016 MOI) (Document 149-7.)   Investigators and Deloitte representatives agreed that the next step would be comparing Deloitte and Sagitec materials.   The United States formally opened an investigation on February 3, 2017.

In its response to the motion, the United States indicates that case agents conducted interviews and reviewed files between 2017 and 2019.   On December 3, 2019, the United States informed Sagitec that it was the target of a criminal investigation.   Counsel for the United States met with counsel for Sagitec on February 11, 2020, after which Sagitec initiated an internal investigation.   Sagitec provided a draft report of its internal investigation to the United States on or about October 13, 2020.   Agents continued to conduct interviews in late 2020, including with Mr. Minkkinen and Mr. Peterson.   Mr. Minkkinen was sent a target letter in December 2020.   Mr. Sambasivam was interviewed on March 12, 2021, and sent a target letter on or about March 16, 2021.   The United States made a proffer to Mr. Minkkinen's counsel on March 18, 2021, and engaged in several additional communications over the next fifteen months.   The United States made a proffer to Mr. Sambasivam's counsel on April 21, 2021, and engaged in several additional communications thereafter.

The Defendants issued subpoenas pursuant to Rule 17(c) to states that Deloitte contracted with to develop unemployment insurance software solutions in order to obtain relevant documentation.   Minnesota filed a response indicating that its data retention period "for most categories is 11 years or shorter," with a 6-year retention period applicable to contracts.   The

---

7  The Court notes that the Defendants have filed *Defendant Sivaraman Sambasivam's and David Minkkinen's Motion in Limine to Establish Ownership of Purported Trade Secret Materials Pursuant to an Unambiguous Written Contract* (Document 207), contending that the materials developed in connection with the Massachusetts project belong to Massachusetts.

office at issue changed locations twice, most recently in May 2022.   In connection with the 2022 move, the office destroyed documents that were outside the retention period.   Thus, Minnesota was unable to provide documents responsive to requests related to federal funding for the project, Deloitte's response to the request for proposals, the funding source for the project, final executed version of the contract for the unemployment insurance project, data models, diagrams, source code, use cases or other artifacts from the project, use cases from the project, any sharing of project materials with other states or vendors, documents related to maintenance of the software, communications with the Department of Labor regarding a license to the software, and communications with the Department of Labor regarding any request to share the software. Minnesota did provide partial versions of some contracts, as well as information from employees with relevant knowledge.   New Mexico and Massachusetts were likewise unable to provide full responses to the Rule 17(c) subpoenas because many documents and communications were no longer available.

## ARGUMENT

The Defendants contend that the six-year delay between the time the investigation began and the filing of the indictment was unreasonable and prejudicial.   They note that a total of nine years passed between the time they worked at Deloitte and had access to Deloitte files, and the return of the original indictment.   They note two types of prejudice: the state, federal, and private entities involved "have reasonably and foreseeably not retained documents likely to undercut the trade secret determination itself" and two key exculpatory witnesses died before the indictment was returned.   (Def.s' Mot. at 16.)   They argue that documents demonstrating that the materials developed by Deloitte in connection with the Massachusetts, New Mexico, and Minnesota

10

contracts cannot properly be classified as trade secrets are, in part, unavailable because the state agencies involved purge documents periodically.   For instance, the Defendants sought information from the states related to whether materials involved in the development of the unemployment insurance systems were subject to protective measures to maintain secrecy, as well as the level of state collaboration in developing the material claimed to be trade secrets belonging to Deloitte, but they cannot procure state records because of the passage of time.   They further contend that Mr. Peterson and Mr. Tackett would both have been exculpatory witnesses, citing statements they made in interviews with investigators prior to their deaths.   Mr. Tackett's name appears in the metadata that investigators found suspicious. The Defendants argue that his explanation regarding the development and ownership of the material would counter the claim the metadata reveals a conspiracy to misappropriate trade secrets.

The United States argues that the Defendants cannot show actual and substantial prejudice. It contends that any lost evidence would have been of limited impact.   The United States argues that any assertion that the unavailable documents from Minnesota, Massachusetts, and New Mexico would have been exculpatory is speculative, and the documents at issue could have been purged even before the United States began its investigation.   It further contends that the Defendants were informed of the investigation before the indictment and could have sought the documents earlier or requested that the state agencies preserve them.   The United States argues that the Defendants cannot establish that they are unable to obtain testimony similar to the testimony unavailable from Mr. Tackett and Mr. Peterson from other sources.   It indicates that Mr. Peterson faced potential indictment on similar charges, and therefore may have been unwilling to waive his Fifth Amendment right and offer substantive trial testimony.   The United States

11

further contends that Mr. Tackett's testimony would be of limited value because he left Deloitte in March 2013 and did not join Sagitec until May 2019, after most of the criminal conduct had occurred.   Further, the United States argues that the criminal conduct associated with the false statements counts occurred less than two years before the return of the original indictment, and dismissal of the entire indictment would be improper.   Finally, the United States contends that it acted in good faith in conducting a protracted and complex investigation involving voluminous discovery, witnesses in multiple states, and research into a variety of legal issues, with some disruption as a result of the COVID-19 pandemic in 2020 and 2021.

In supplemental briefing related to the superseding indictment, the Defendants argue that records and testimony related to the development of unemployment insurance systems for Minnesota, Massachusetts, and New Mexico remain central to the case.   They argue that both unavailable state documents and the unavailable testimony of Mr. Tackett and Mr. Peterson would help establish that the Defendants and others working for Bearing Point, then Deloitte, did not treat or view project deliverables as proprietary material belonging to the company.   They indicate that Mr. Peterson worked for the State of Minnesota during its unemployment insurance project with Bearing Point, then later worked for Deloitte, and "would have testified that uFACTS was collectively created by Minnesota and Deloitte during the Minnesota unemployment insurance modernization project, supporting the fact that UFACTS materials were created entirely with federal and state funds and could not be trade secrets."  (Def.'s Supp. at 3.)   Mr. Peterson could also have testified that Massachusetts shared artifacts with New Mexico, further supporting the Defendants' position that the states, rather than Deloitte, owned the project deliverables and that personnel involved in the projects for both the states and Deloitte understood that Deloitte did not

retain a proprietary interest in the materials after project completion.   The Defendants also point

to a document signed by Deloitte employees before beginning work on the Massachusetts project,

recognizing that information would become "the sole property of the Commonwealth."   (Def.'s

Supp. at 4) (citing Document 207-1, Massachusetts Statement of Work.)   Signed copies are no

longer available.

The United States argues that, because it removed the substantive count of theft of trade

secrets that was in the original indictment, it no longer needs to prove that a trade secret actually

existed.   Instead, to prove a conspiracy to steal trade secrets, it must only prove that the

Defendants believed the information at issue was confidential or proprietary.   Thus, the United

States argues, the claim of pre-indictment delay is moot because the alleged prejudice centers on

evidence related to the question of whether a trade secret existed.

## APPLICABLE LAW

Although the statute of limitations is the primary mechanism to define the time within

which the government must initiate a prosecution, the Supreme Court has also recognized that the

Due Process Clause of the Fifth Amendment may require dismissal due to delayed prosecution in

some instances, determined based on "a delicate judgment based on the circumstances of each

case."   *United States v. Marion*, 404 U.S. 307, 324–25 (1971) (declining to "determine when and

in what circumstances actual prejudice resulting from pre-accusation delays requires dismissal of

the prosecution").   The Supreme Court distinguished between investigative delay and delay

designed to gain a tactical advantage, holding that "to prosecute a defendant following

investigative delay does not deprive him of due process, even if his defense might have been

somewhat prejudiced by the lapse of time."   *United States v. Lovasco*, 431 U.S. 783, 795–96

13

(1977) (finding dismissal inappropriate where an 18-month delay permitted investigation of potential additional defendants, although none were charged). The Court emphasized the potential negative consequences of a rule that would require prosecutors to rush to indict before completing an investigation and giving due consideration to the appropriate charges. *Id.*

In the Fourth Circuit, if a defendant moving to dismiss for preindictment delay meets her burden to "establish actual prejudice, then the court must balance the defendant's prejudice against the government's justification for the delay." *Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990) (rejecting a test in other circuits requiring a defendant to prove improper prosecutorial motive). "The basic inquiry then becomes whether the Government's action in prosecuting after substantial delay violates 'fundamental conceptions of justice' or 'the community's sense of fair play and decency.'" *United States v. Automated Med. Lab'ys, Inc.*, 770 F.2d 399, 403–04 (4th Cir. 1985) (quoting *United States v. Lovasco,* 431 U.S. 783, 790 (1977)). In *Howell*, the state conceded that the "justification for the preindictment delay was mere convenience," and there was no assertion that the case was "particularly complicated, or that the state was engaged in preindictment investigation." *Howell*, 904 F.2d at 895. Thus, the Fourth Circuit concluded that there was "no valid justification…for the preindictment delay that prejudiced the defendant" and the writ of habeas corpus for unconstitutional preindictment delay was properly granted. *Id.*

Proving actual prejudice is a high bar. In *Lovasco*, the Supreme Court noted that in the more than five years since its decision in *Marion*, "so few defendants have established that they were prejudiced by delay that neither this Court nor any lower court has had a sustained opportunity to consider the constitutional significance of various reasons for delay." *United States v. Lovasco*, 431 U.S. 783 at 796–97. Courts have had more opportunities to address

14

preindictment delay in the intervening years, yet the great majority of such motions are still decided on a failure to establish actual prejudice. *See, e.g.*, *United States v. Shealey*, 641 F.3d 627, 633–34 (4th Cir. 2011); *Jones v. Angelone*, 94 F.3d 900, 909 (4th Cir. 1996); *United States v. Muhammad*, No. 3:21CR34 (DJN), 2021 WL 4473143, at *2 (E.D. Va. Sept. 29, 2021); *United States v. Moore*, 299 F. Supp. 2d 623, 627 (S.D.W. Va.), *aff'd*, 116 F. App'x 421 (4th Cir. 2004) (Chambers, J.).    Proving actual, substantial prejudice requires a defendant to "show actual prejudice, as opposed to mere speculative prejudice" and requires that "he show that any actual prejudice was *substantial*—that he was meaningfully impaired in his ability to defend against the state's charges to such an extent that the disposition of the criminal proceeding was likely affected." *Jones v. Angelone*, 94 F.3d at 907 (internal citation omitted).    In detailing the types of evidence necessary, the Fourth Circuit explained that

> When the claimed prejudice is the unavailability of witnesses, as here, courts have generally required that the defendant identify the witness he would have called; demonstrate, with specificity, the expected content of that witness's testimony; establish to the court's satisfaction that he has made serious attempts to locate the witness; and finally show that the information the witness would have provided was not available from other sources.

*Id.*

In *United States v. Automated Med. Lab'ys, Inc.*, a medical lab and three members of management were indicted on December 12, 1983, for "engaging in a conspiracy that included falsification of logbooks and records." 770 F.2d at 400.   The FDA began enforcement efforts related, in part, to recordkeeping issues in 1977, and began a more thorough investigation in March 1980, with a final report prepared in October 1980. *Id.*   The FDA referred the matter to the Department of Justice in March of 1982. *Id.*   One potential defendant left the country before the

indictment was returned.  *Id.*  The Fourth Circuit expressed skepticism that the loss of that testimony was significantly prejudicial, explaining that he could have invoked his Fifth Amendment right not to testify, and that the content of any testimony was speculative.  *Id.* at 404. The Court's analysis balancing the prejudice against the reasons for the delay is instructive:

> Assuming some slight prejudice to AML, it seems clear that there is no violation of due process when the Government's reasons for the delay are considered. The government contends that the delay was justified by the lengthy administrative review process at the FDA which is not necessarily geared toward a criminal investigation, by the time required for Government attorneys to become familiar with a complex case involving a federal regulatory scheme, and by manpower problems in the United States Attorney's office in Richmond. The Government also argues, and we agree, that at least a portion of the delay was attributable to additional investigative activities required when the case actually reached Government prosecutors at the Department of Justice and the U.S. Attorney's Office. *While such reasons may not suffice where the actual prejudice to the defendant from the delay is substantial*, we find that there is no due process violation when these reasons are considered in light of the slight, possibly nonexistent, prejudice suffered by AML.

*Id.* (emphasis added).

## DISCUSSION

The Defendants herein have unusually specific and detailed evidence regarding prejudice. Two witnesses, one a potential co-defendant, died during the 6-year period between the beginning of the investigation and the return of the original indictment.   Both gave recorded interviews prior to their deaths, eliminating much of the speculation usually inherent in considering potential testimony from unavailable witnesses.   Mr. Peterson[8] provided explanations as to both why he

---

[8] The United States indicates that it views Mr. Peterson as an unindicted co-conspirator.  An exchange during a

used documents with Deloitte metadata during the Consortium project, and why he did not view the source code, use cases, and other materials used in state projects for Deloitte as trade secrets. Mr. Peterson's experience working on the Minnesota project for the State of Minnesota before beginning employment with Deloitte and its predecessor companies would make his testimony regarding the relationship between the states and Deloitte particularly valuable. His interview statement that he re-used a Deloitte document for use cases by deleting the content and retaining the formatting, headers, and numbering would be important in countering an implication that the presence of Deloitte metadata on documents used during the Consortium project suggests an intention or conspiracy to steal confidential or proprietary information. The United States has repeatedly emphasized its position that all it must prove to obtain a guilty verdict on the conspiracy to steal trade secrets charge is that the Defendants believed that the Deloitte documents or materials were proprietary. Corroborating evidence that a purported co-conspirator did not believe the materials were proprietary would be highly significant.

Mr. Tackett's missing testimony would have been perhaps even more valuable to the Defendants because he did not begin working for Sagitec until May 2019, reducing the risk that he could be viewed as a co-conspirator involved in transferring material from Deloitte to Sagitec. Documents with his name in the metadata were found during the course of the investigation, when he was still employed with an unrelated company. In a recorded statement, he indicated that he

---

hearing on a motion for a bill of particulars highlights the potential for prejudice caused by his unavailability as either a co-defendant or a witness. Magistrate Judge Aboulhosn asked the United States to specify what these Defendants had done in West Virginia that would establish venue. (Hearing Tr. at 25::2–8.) The AUSA struggled to provide a clear answer, finally stating that "there's also at least one unindicted co-conspirator who's no longer alive. And so I don't have to show that they [these Defendants] physically placed the – anything on – the servers in West Virginia," while acknowledging that he would "have to show that someone involved in the conspiracy did." (*Id.* at 25::10–24.) Mr. Peterson's death leaves the United States free to attempt to fill gaps in its case with evidence or supposition that he—and the Defendants—are unable to challenge, and the exchange recounted above suggests an inclination to do so.

had not worked on many documents for which the metadata listed him as a creator at Deloitte. That, like Mr. Peterson's statement, casts considerable doubt on the value of the metadata evidence.   He also worked on the New Mexico project for Deloitte and indicated that the software and deliverables became the property of New Mexico at the conclusion of the project.   Like Mr. Peterson's testimony, such testimony would be highly exculpatory, going to the heart of the United States' case that the Defendants believed the Deloitte state project materials were proprietary and confidential.   If another Deloitte employee who worked on the New Mexico project—and was not under investigation in this matter—understood the project materials to belong to the state, it casts substantial doubt on the United States' theory that these Defendants believed material developed during the New Mexico, Massachusetts, and Minnesota projects were Deloitte trade secrets.

Similarly, unavailable materials from the states that Deloitte and its predecessor companies contracted with to develop unemployment insurance systems would be highly valuable for the Defendants, and highly probative.   It would corroborate the testimony of Mr. Peterson and Mr. Tackett that the materials were not trade secrets.   Deloitte employees working on the state projects, including the Defendants as well as Mr. Peterson and Mr. Tackett, would have developed an understanding of the nature of the materials being developed, who owned them, whether they were confidential or proprietary, and whether they could be shared between states and other entities based on the communications, work product, and contracts and other documentary evidence developed during the course of the projects.   Signed copies of the *IP Agreement for Vendor's Employees, etc.* included in BearingPoint's contract with Massachusetts would likely be quite impactful to a jury considering whether the Defendants' use of these materials was wrongful.

18

Therein, employees acknowledge that "[a]ll confidential, proprietary or other trade secret information…conceived, developed, or otherwise made by you, alone or with others, and in any way relating to the Commonwealth or any of its web development projects…shall be the sole property of the Contractor's customer, the Commonwealth."   (MA Contract at 49–50, att'd to Document 207-1.)   The Defendants' signatures on that document would be strong evidence that they did not believe materials developed during the course of the Massachusetts project belonged to Deloitte.

In sum, both the unavailable state documents and the deceased witnesses would provide highly probative exculpatory evidence.   The level of prejudice turns, in part, on the other evidence available as to the contested issues.   There is no indication that the United States has "smoking gun" evidence establishing that these Defendants conspired to steal Deloitte's trade secrets, knowing or believing that the materials at issue were proprietary and confidential.   Instead, based on the presentations thus far, it appears that the United States intends to rely on context and circumstance, as well as prior interviews, to establish the Defendants' beliefs.   The metadata, assorted witness testimony, and previous statements from the Defendants would, presumably, be used to convince the jury of the Defendants' state of mind.   Strong contrary evidence, that the states owned all project deliverables, which the Defendants and other Deloitte employees, working on the previous state projects, would have understood, based on contractual language, an understanding between the parties, and communications and processes shared during the projects, would be likely to weigh heavily in favor of an acquittal.[9]   The anticipated testimony from Mr.

---

[9] The United States stresses that the case turns on the Defendants' *belief* about whether the materials were a trade secret, rather than substantive evidence of whether any of the materials actually legally constitute trade secrets.   Even accepting that formulation as accurate, the same evidence that is relevant to whether the materials were trade secrets is relevant to whether the Defendants believed them to be trade secrets.   Both Defendants' positions at both Deloitte

Peterson and Mr. Tackett calls into question the idea that the Defendants, or other employees in their position, would have viewed the materials as trade secrets, the reliability and import of the metadata as evidence, and the existence of a conspiracy.   This evidence, if available, could change the outcome of a trial.

The United States suggests that the state documents may have been unavailable even if the Defendants had been indicted earlier.   But for at least the Minnesota documents, there is evidence that much of the material was purged only during an office move in May 2022.   Document retention policies permitting documents to be purged after several years are quite foreseeable, but do not excuse a failure to promptly seek out documents that may be subject to such policies.   Many entities, like Minnesota, have policies requiring documents to be retained for a specified period, but no mechanism to automatically delete them at the expiration of that period.   In its 6-year investigation into whether Sagitec and/or its employees stole trade secrets from Deloitte, the United States and its investigators apparently did not think to seek out documents that would help establish whether Deloitte even owned the materials at issue.   Thus, the Court refuses to join the United States in speculating that the Defendants would have been unable to obtain the exculpatory evidence at issue even if the prosecution had been initiated years earlier.

Having found actual, substantial prejudice resulting from the United States' delay in initiating this prosecution, the Court must turn to the justification for the delay.   *United States v. Automated Med. Lab'ys, Inc.*, 770 F.2d at 404.   The United States did not supply exhibits or testimony from investigators detailing the investigative timeline, and so the Court relies on the representations in its brief, in combination with the other evidence submitted.   The United States

---

and Sagitec included involvement in negotiating the contracts at issue and working directly with the state employees leading the projects.

became aware of allegations against Sagitec related to the Consortium project in the summer of 2016 and formally opened an investigation in February 2017.   It conducted approximately 31 interviews and reviewed documents before informing Sagitec that it was the target of a criminal investigation on or about December 3, 2019.   Sagitec performed an internal investigation, and the United States conducted interviews with several employees, including Mr. Minkkinen and Mr. Peterson.   By Spring of 2021, the United States had informed both Defendants that they were targets of the investigation and begun engaging in pre-indictment discussions with their counsel. Investigators continued reviewing emails turned over by Sagitec, and conducted a witness interview on July 21, 2022, approximately one month before the August 23, 2022 original indictment.

There is not sufficient evidence to establish that the United States had an improper motive for conducting such a prolonged investigation.   However, there is also little explanation for the length of the investigation.   The United States indicates that it conducted 31 interviews and reviewed documents during the nearly three years between formally opening the investigation in February 2017—at which point investigators had already received Sagitec documents and conferred with Deloitte—and informing Sagitec that it was the target of a criminal investigation on December 3, 2019.   The investigation appears to have gained some momentum for a year or so thereafter, with additional interviews with potential targets of the investigation and cooperation with respect to Sagitec's internal investigation.[10]   Then more than a year passed, explained only by purported pre-indictment discussions and review of additional emails, before the United States

---

10  The Court notes that Sagitec completed its internal investigation into these matters in approximately one year.

finally brought the original indictment, nearly a decade after the Defendants allegedly took Deloitte materials with them when they left employment with Deloitte to work at Sagitec.

The delay here, even lengthier than that considered by the Fourth Circuit in *Automated Medical Laboratories*, is also less justifiable and must be balanced against actual, substantial prejudice that interferes with the Defendants' right to a fair trial. There, the court found that much of the delay was attributable to an administrative regulatory process with the FDA before the matter reached federal prosecutors. *United States v. Automated Med. Lab'ys, Inc.*, 770 F.2d 399, 403–04 (4th Cir. 1985). Federal prosecutors were aware of the basic nature of the allegations against Sagitec and its employees in the summer of 2016. Despite the greater justification for the length of the investigation in *Automated Medical Laboratories*, the Fourth Circuit found that "such reasons may not suffice where the actual prejudice to the defendant from the delay is substantial." *Id.* at 404. Having been presented with just such a case, the Court finds that the United States' justifications are insufficient in light of the extent of the prejudice caused by the delay. Because of the United States' unjustified delay, the Defendants have been deprived of evidence and testimony that may well have persuaded a jury that they did not believe Deloitte owned any of the purported trade secrets material. A trial on those counts for which the missing evidence would be relevant does not comport with their right to due process under the Fifth Amendment of the Constitution.

The parties did not fully set forth their positions as to how each count of the superseding indictment is impacted by the preindictment delay.

Count One alleges a conspiracy to steal trade secrets. The unavailable evidence and witnesses would be central to a defense on this count, and the Court finds that it must be dismissed.

22

Count Two alleges conspiracy to commit wire fraud, based on the Defendants' purported improper use of Deloitte intellectual property in connection with the Consortium project. Count Two, likewise, centers on the core information impacted by the delay: whether the materials at issue are, in fact, Deloitte's intellectual property, and whether the Defendants would have believed them to be Deloitte's intellectual property. Count Two should also be dismissed. Counts Three through Five allege wire fraud, based on the same purported scheme to defraud the Consortium by improperly using Deloitte's intellectual property. Those counts also should be dismissed.

The remaining false statement counts require a careful analysis. Count Six alleges that Mr. Minkkinen sent an email to federal agents on or about September 14, 2017, which included an attached letter dated August 23, 2016, with the false statement that "[c]ertainly the allegation that Sagitec has in any way misappropriated another party's property is defamatory." (Superseding Indictment at ¶ 65.) The falsity of that statement turns on whether Mr. Minkkinen knew or believed that Deloitte owned the materials at issue, as well as whether Sagitec was misusing such materials. Thus, Count Six must be dismissed given the Court's earlier findings regarding delay and prejudice.

Count Seven alleges that Mr. Minkkinen's September 14, 2017 email included an attachment dated January 15, 2017, in which Mr. Minkkinen made the false statement that former Deloitte employees working at Sagitec had not "retained any software, source code, or any other tangible artifacts authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client after leaving Deloitte's employment." (Superseding Indictment at ¶ 67.) It is not obvious that the evidence and testimony made unavailable by the preindictment delay have a substantial impact on Count Seven. The alleged false statement involves whether Sagitec employees, including Mr.

Minkkinen, retained material *authored* by Deloitte, Deloitte subcontractors or consultants, or Deloitte clients.   Whether Deloitte had an ongoing proprietary interest in such materials and whether state clients for unemployment insurance systems owned project deliverables may not be core issues as to Count Seven, although the Court recognizes that the testimony from Mr. Peterson and Mr. Tackett regarding alternative explanations for Deloitte metadata and similarities to Deloitte documents would be relevant.   The Court finds that Mr. Minkkinen has not demonstrated actual, substantial prejudice as to Count Seven at this stage, and the motion to dismiss should be denied, without prejudice to its renewal based on the issues and evidence presented at trial.

Count Eight alleges that a January 15, 2017 attachment to Mr. Minkkinen's September 14, 2017 email falsely stated that Sagitec had not "obtained copies of any software, source code, or any other tangible software artifacts authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client after leaving Deloitte's employment."   (Superseding Indictment at ¶ 69.)   For the same reasons outlined as to Count Seven, the Court finds that the motion to dismiss Count Eight should be denied without prejudice to its renewal based on the issues and evidence presented at trial.

Count Nine alleges that during an October 1, 2020 interview, Mr. Minkkinen was asked "whether he brought anything from Deloitte when he came to Sagitec" and responded "No, and…that's entirely false."   (Superseding Indictment at ¶ 71.)   Count Nine alleges that Mr. Minkkinen's statement was false because he knew he had taken Deloitte intellectual property. As with Count Six, proving—or defending—the claim that Mr. Minkkinen took Deloitte intellectual property requires addressing the ownership and status of the state materials.   The

evidence rendered unavailable as a result of the pretrial delay could impact the outcome as to Count Nine, and so the Court finds that it must be dismissed.

Count Ten alleges that, during the October 1, 2020 interview, Mr. Minkkinen falsely stated that "I can assure you both that there was nothing of Deloitte technology that was used in [Sagitec's] solution, period." (Superseding Indictment at ¶ 73.) Like Count Six and Nine, determination as to whether Mr. Minkkinen's statement was false turns on both whether Sagitec used technology developed during Deloitte's state contracts and whether that technology belonged to Deloitte following completion of those contracts. The preindictment delay deprived Mr. Minkkinen of exculpatory evidence as to those issues, and the Court finds that Count Ten should be dismissed.

Count Eleven alleges that, during the October 1, 2020 interview, Mr. Minkkinen was asked whether he had taken Deloitte use cases and responded, "No, no, and it wouldn't even be useful. Like if I took the [Deloitte] use case from New Mexico it wouldn't even be useful…, because they're, like I said, 30 percent different state by state…[I]t wouldn't even make sense." (Superseding Indictment at ¶ 75.) It is alleged that he stated this despite knowing that he had taken "use cases from a Deloitte project in Massachusetts, transmitted them to Sagitec employees, and knew that they were used to develop Sagitec's Neosurance product." (Superseding Indictment at ¶ 75.) This statement, like those in Counts Seven and Eight, addresses only whether Mr. Minkkinen took the use cases and knew they were *used* at Sagitec, not whether the use cases were trade secrets or intellectual property owned by Deloitte. Although Mr. Peterson's similar statement, that re-using use cases from another state would not be helpful, would provide valuable corroboration, the Court cannot find at this point that the preindictment delay caused actual,

25

substantial prejudice.   Therefore, the motion to dismiss Count Eleven should be denied without prejudice.

Count Twelve alleges that, during the October 1, 2020 interview, Mr. Minkkinen falsely stated that "If somebody was using the [Deloitte] use case from another state I'm not aware of it…" though he knew that he had taken use cases from Deloitte's Massachusetts project, transmitted them to Sagitec employees, and they were used to develop Sagitec's Neosurance project.   (Superseding Indictment at ¶ 77.)   For the reasons discussed as to Count Eleven, the Court finds that Count Twelve should not be dismissed.

Count Thirteen alleges that Mr. Sambasivam was interviewed on or about March 12, 2021, and was asked whether he was aware of any Sagitec employees who had worked for Deloitte taking Deloitte intellectual property with them.   He responded: "It's hard for me to say whether they took it or not…David [Minkkinen] has had some material, that I know of, some proposal material I've seen.   I don't know if that's considered as intellectual property or not, but I've seen that." (Superseding Indictment at ¶ 79.)   The Superseding Indictment alleges that Mr. Sambasivam was aware that Mr. Minkkinen had "obtained uFACTS source code and use cases from Deloitte's Massachusetts project, which defendant Sivaraman Sambasivam fully understood to be Deloitte intellectual property."   (*Id.*)   Whether the Massachusetts material constitutes Deloitte intellectual property, and Mr. Sambasivam's belief about whether any material constituted trade secrets, is central to Count Thirteen, and the exculpatory evidence and testimony unavailable as a result of the unjustified preindictment delay could lead a jury to resolve that issue in favor of the Defendant. Therefore, the Court finds that Count Thirteen should be dismissed.

26

Count Fourteen alleges that, during the March 12, 2021 interview, Mr. Sambasivam was asked whether he took Deloitte materials and stated "No, I did not." (Superseding Indictment at ¶ 81.) Again, whether the materials in question were owned by Deloitte or Massachusetts could influence the outcome as to Count Fourteen, and the Court finds that it should be dismissed.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that *Defendant Sivaraman Sambasivam's and David Gerald Minkkinen's Joint Motion to Dismiss the Indictment Due to the Government's Pre-Indictment Delay* (Document 149) be **GRANTED** as to Counts 1, 2, 3, 4, 5, 6, 9, 10, 13 and 14, and **DENIED** as to Counts 7, 8, 11 and 12.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendants and their respective counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER:     June 26, 2023

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA