**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v. CRIMINAL ACTION NO. 2:22-cr-00163

DAVID GERALD MINKKINEN
SIVARAMAN SAMBASIVAM,

Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *Defendants' Sivaraman Sambasivam's and David Gerald Minkkinen's Motion to Exclude the Report and Testimony of Walter Overby* (Document 192), the *Government's Response in Opposition to Defendants' Sivaraman Sambasivam's and David Gerald Minkkinen's Motion to Exclude the Report and Testimony of Walter Overby* (Document 233), and all attached exhibits. For the reasons stated herein, the Court finds that the Defendants' motion should be granted, and the report and testimony of Walter Overby should be excluded.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The Defendants, Sivaraman Sambasivam and David Gerald Minkkinen, were indicted in a multi-count *Superseding Indictment* (Document 186). As to Defendant Sambasivam, the indictment charges that he has violated 18 U.S.C. § 1832(a)(5) (Conspiracy to Steal Trade Secrets), 18 U.S.C. §§ 1343 and 1349 (Conspiracy to Commit Wire Fraud), 18 U.S.C. § 1343 (Wire Fraud), and twice violated 18 U.S.C. § 1001(a)(2) (Making of a False Statement). As to Defendant David Minkkinen, the indictment charges that he has violated 18 U.S.C. § 1832(a)(5) (Conspiracy to

Steal Trade Secrets), 18 U.S.C. §§ 1343 and 1349 (Conspiracy to Commit Wire Fraud), twice violated 18 U.S.C. § 1343 (Wire Fraud), and violated 18 U.S.C. § 1001(a)(2) (Making of a False Statement) seven times.

Generally, the indictment alleges the following: Deloitte owned and marketed a web-based software platform, Unemployment Framework for Automated Claim & Tax Services (uFACTS). This software platform was used to process unemployment claims for state agencies. The platform's "source code, database, data tables, use cases, software designs, business rules, schema, logic, artifacts, and architecture constituted Deloitte intellectual property." (Superseding Indictment ¶ 1.) This uFACTS platform had been implemented in Minnesota, New Mexico, and Massachusetts. The Defendants were employed by Deloitte, with Defendant Minkkinen as the Unemployment Insurance Practice Leader and Defendant Sambasivam as the lead system architect for the uFACTS Solution Framework.

Between June 2013 and December 2015, eleven employees left Deloitte and began working for Sagitec Solutions, LLC, which also had an Unemployment Insurance practice. Mr. Minkkinen and Mr. Sambasivam separately left Deloitte and joined Sagitec in 2013. In their employment contracts with Deloitte, the Defendants agreed to not disclose any of Deloitte's proprietary property to third parties or retain the property. Defendant Minkkinen also was reminded through a resignation checklist that he was not to copy client or Deloitte information, and he was to return all records that he had checked out and return all "work in progress files." (*Id.* ¶ 8.)

However, pursuant to an agreement between the Defendants, first Defendant Minkkinen, and then Defendant Sambasivam, copied and downloaded several pieces of Deloitte proprietary

information, including the uFACTS source code, data, and use cases, without authorization.[1] For example, between 2013 and 2015, one or both of the Defendants copied or transferred to Sagitec an executive summary of Deloitte's response to a request for proposal, a marketing brochure, Deloitte's uFACTS related fraud detection deliverables for Wisconsin and Minnesota, use case documents from Deloitte's Massachusetts's uFACTS project, the uFACTS Oracle database, the uFACTS Data Definition Language, a 227-page document titled the "uFACTS Solution Framework," and a spreadsheet titled "Deloitte Consulting Project Pricing Model." The information was mostly transmitted over email, sometimes between the two Defendants, and at other times included other Sagitec employees. In addition to the information sent by the Defendants, there were emails sent by Sagitec employees to the Defendants, discussing additional information regarding Deloitte's uFACTS software, including the uFACTS code base and use cases.

Until on or about September 20, 2013, Defendant Sambasivam had been employed by Deloitte, but was communicating with Sagitec employees, including Defendant Minkkinen, about the uFACTS software. While still employed by Deloitte, Defendant Sambasivam emailed both a link and corresponding login information to a Sagitec employee for Deloitte's Massachusetts project.

In or about 2015, Sagitec was awarded a contract to design and develop an unemployment insurance benefit claim software system for the states of Maryland and West Virginia. The interests of the two states combined into the Maryland-West Virginia Consortium (Consortium). In Sagitec's contract with the Consortium, signed by Defendant Minkkinen, Sagitec agreed that its

[1] More specific instances and examples of the copying and transmission of information from Deloitte are included in the Superseding Indictment ¶¶ 11-31.

work product would not infringe on the proprietary rights of a third party. The money to fund the project was provided by federal grants from the United States Department of Labor.

To complete the project, Sagitec employees worked with state employees from West Virginia and Maryland. In 2016, West Virginia state employees noticed that there were references to Massachusetts, New Mexico, and Deloitte within the project materials used by Sagitec. After seeing these references, an employee contacted the West Virginia Commission on Special Investigations. Upon learning of this complaint, a Maryland Assistant Attorney General (MD AAG) sent a letter to Defendant Minkkinen, raising concerns about the project including references to Massachusetts within Sagitec's documents. On approximately July 25, 2016, Defendant Minkkinen replied to the MD AAG with a letter drafted with the help of Defendant Sambasivam, which said that references to other states were innocent, and due to Sagitec using them as examples "to discuss potential implementation options" for West Virginia and Maryland. (*Id.* ¶ 34.) The Defendants made these statements despite their preexisting knowledge and firm belief that Deloitte considered the subject information to constitute trade secrets.

In reply, the MD AAG sent a follow-up letter to Defendant Minkkinen asking, in part, whether any Sagitec employees had "retained . . . any software, source code, data tables, data structures, data dictionaries, documentation, deliverables, or other works" belonging to Deloitte, or had incorporated such items into any work delivered to the Consortium. (*Id.* ¶ 35.) In a response to this questionnaire, prepared by both Defendants, and signed by Defendant Minkkinen, they denied that any Sagitec personnel had ever retained any of the listed information or had incorporated it into their work for the Consortium. This position was again stated by Defendant

Minkkinen during a November 10, 2016, meeting with officials from Maryland's Department of Labor, Licensing, and Regulation.

Upon learning of a criminal investigation, Defendant Minkkinen sent copies of the response letters, addressed to the MD AAG, to the investigators in West Virginia and Virginia. During later interviews by an investigating agent in Charleston, West Virginia, both Defendants continued to deny any retention or use of Deloitte's proprietary information.

The Defendants have continued to repeatedly deny any improper use of Deloitte's uFACTS software. For example, Deloitte began accusing Sagitec of theft of trade secrets in 2016. Relying on statements made by the Defendants, Sagitec's counsel denied Deloitte's accusations.[2] In response to a later follow-up letter from Deloitte, with the assistance of the Defendants, Sagitec again denied that they had obtained any Deloitte proprietary materials.

The United States has indicated that it intends to support its case using the expert testimony of Walter Overby. Mr. Overby has a history as a software developer with a Bachelor of Science in Computer Science, and now acts as a consultant for law firms in cases involving intellectual property and software development.

## REPORT SUMMARY

In his report, Mr. Overby outlines two general inquiries. First is a "metadata analysis" of Sagitec's documents, and the second is a comparison of Deloitte's and Sagitec's source code. Mr. Overby was provided with three "productions." The first contained 20,000 of Sagitec's files. The second contained three folders from Deloitte, with the first two containing "computer source

[2] Deloitte is currently pursuing a civil claim for theft of trade secrets, specifically related to the uFACTS software, against Sagitec. *Deloitte Consulting LLP et al v. Sagitec Solutions LLC*, 1:23-cv-325 (D. De. 2023).

code" and the third folder containing approximately 4,000 documents. The third production, the "Deloitte uFACTS production," was also from Deloitte, and contained 88 documents.

Regarding his metadata analysis, Mr. Overby reports that he used "the software ExifTool by Phil Harvey to extract metadata from the Microsoft Word files in the Sagitec production." (Overby Report at 3) (Document 192-1.) Mr. Overby states that he analyzed 889 files,[3] and provides a short list of metadata statistics:

> Number of files with "Creator" value "Tackett, Philip L": 252 (28%)
> Number of files with "Company" value "Deloitte": 241 (27%)
> Number of Microsoft Word files with a "LastPrinted" date earlier than July 15, 2013: 227 (28%)
> Number of Microsoft Word files with a "LastPrinted" date earlier than "CreateDate": 766 (96%)

(*Id.* at 4.) After providing the statistics, the report does not further explain their significance or offer any other insight into the metadata contained in Sagitec's production.

The starting place for Mr. Overby's comparison of Sagitec's and Deloitte's documents began with him providing a spreadsheet, summarizing the metadate of Sagitec's documents, to the United States. This spreadsheet was returned to Mr. Overby with a new column titled "Deloitte File Name." Counsel for the United States told Mr. Overby "that this new column listed files in Deloitte's possession that might be similar to files in the Sagitec collection." (*Id.* at 3.) In response, Mr. Overby stated he "understood that [he] should locate the corresponding Sagitec file" and then "use [the] file comparison feature of Microsoft Word to generate a redline between the Deloitte file and the corresponding Sagitec file." (*Id.* at 3–4.) To accomplish this comparison,

[3] Of those 889 files, the "Application" for 791 of them was Microsoft Word. Mr. Overby states that the ExifTool was used to "extract metadata from Microsoft Word files." (Overby Report at 3.) If 889 files were examined and only 791 of them were Microsoft Word files, the Court is unsure if the ExifTool was used to analyze the other 98 files and what type of file those documents were.

Mr. Overby wrote a short script that would use the automatic comparison feature in Microsoft Word to open a Sagitec document, compare it with a Deloitte document, and then save the red-lined result as a new file. This comparison was performed on an undisclosed number of documents.[4]

The report does not summarize the results or significance of the document comparisons. The report does reference the comparison files in the context of "use cases."[5] But, even in this later reference, the report does not offer any opinions or conclusions on comparisons between Deloitte and Sagitec use cases. Rather, the comparison files are referenced to act as "examples" of what constitutes a use case, and what a given Deloitte use case would do. In total, excluding a summary of Mr. Overby's qualifications, the report is no greater than four pages in length. The report contains one conclusion paragraph, which states in full:

> I declare under penalty of perjury of the law of the United States that all statements made herein of my own knowledge are true, and that any statements made on information and belief are believed to be true. Pursuant to Fed. R. Crim. P. 16(a)(1)(G)(v), I approve the foregoing disclosure.

(*Id.* at 6.)

**LEGAL STANDARD**

Rule 702 of the Federal Rules of Evidence provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and

---

[4] Mr. Overby does state that the redline documents were placed in a ZIP archive. This archive may reveal how many documents were subjected to comparison. However, no such archive has been made available to the Court. The report does say that the "Deloitte files were in the uFACTS production" which contained 88 documents. (Overby Report at 3–4.) Therefore, it seems possible that approximately 88 documents were subjected to comparison.

[5] A use case "is a list of actions or event steps, typically defining the interactions between a role and a system to achieve a goal." (Overby Report at 5.)

> methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Supreme Court explained that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable," emphasizing that the standard is flexible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The Supreme Court further explained that the Rule 702 standard is permissive, given that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596. The Fourth Circuit has urged courts to "be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence." However, "given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).

The first requirement, that the expert testimony be helpful to the trier of fact, is the Rule's "touchstone." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). To be helpful, the testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591. Testimony that is "within the common knowledge of the jurors" should be excluded, as it "almost by definition, can be of no assistance to a jury." *United States v. Harris*, 995 F.2d 532, 534 (4th Cir. 1993). "An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion." *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998) (citing *U.S. v. Vitek Supply Corp.*, 144 F.3d 476, 486 (7th Cir. 1998)).

**DISCUSSION**

The Defendants move for the exclusion of Mr. Overby's report and testimony because it "contains no opinions or conclusions and fails to provide any expert analysis of source code or intellectual property." (Pl. Mot. at 2.) The United States responds by stating that (1) Mr. Overby's conclusions and opinions were already provided to the Defendants during pre-indictment discussions and through discovery disclosures, and (2) Mr. Overby's finding that "certain documents in question found in the defendants' possession . . . originated at Deloitte" will assist the jury in determining the "origin, ownership, and use of the documents in question." (Gov. Resp. at 3–4) (Document 233.)

As an initial matter, the fact that Mr. Overby's conclusions and findings may have been provided to the Defendants does not bolster the contents of his report. The burden is on the proponent of the expert testimony to establish, by a preponderance of the evidence, that the expert testimony satisfies Rule 702. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592. Otherwise stated, the proponent of expert testimony must come forward and present evidence from which a court can evaluate its admissibility under Rule 702. Here, the only document that has been provided to the Court is Mr. Overby's Report dated May 1, 2023. Although the United States argues in its response that it has provided additional information to the Defendants both in conversation and discovery responses, that information has not been provided to the Court. Thus, with no additional materials being offered by the proponent,[6] the Court can only consider the text of the May 1 Report.

[6] It is not sufficient that the United States has cited its *Response of the United States of America to Defendant's Standard Discovery Request of the United States for Reciprocal Discovery and Notice of the United States Intent to Offer Evidence of Records of Regularly Conducted Activity* (Document 45). This discovery response merely alludes to "comparisons" included in the discovery disclosures. Without more, the United States has not provided to the

Turning to Mr. Overby's report, it cannot be said that the report or expected testimony from the same meets the standards established by Rule 702 and *Daubert*. Specifically, the report will not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Broadly speaking, Mr. Overby's report contains only cursory statements regarding his methodology but no conclusions or findings. The United States argues that the report will help a jury understand the "origin, ownership, and use of the documents in question." (Gov. Resp. at 3–4.) However, the report contains no conclusion or finding regarding any of those topics. A review of the report shows that Mr. Overby offers (1) his procedure for comparing certain documents, (2) a brief statement on how he extracted the metadata from some documents, (3) a handful of statistics about the metadata, and (4) a description, with examples, of what constitutes a use case. No conclusions or opinions can be found. Without an opinion about the comparisons, offering his methodology for comparing certain documents does not help the jury understand who originated the document. A description of what constitutes a use case is similarly unhelpful, and will undoubtedly be offered by other witnesses, whether lay or expert, who have familiarity with use cases. The metadata statistics, as presented here, cannot constitute an "opinion" or a "conclusion." There are no statements in the report to opine on the significance of the metadata statistics, or even their meaning. Offering the metadata statistics to the jury, without more context or significance as to their meaning, will not assist the jury in its mission.

Additionally, the Supreme Court has stated that since "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it . . . the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more

Court what actually constitutes Mr. Overby's comparisons, findings and/or conclusions about the Sagitec documents.

control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595. The report's failure to offer any opinions as to the origin of the examined documents or to explain what the metadata in Sagitec documents does or *could* mean, creates a strong likelihood that Mr. Overby's report and corresponding testimony will mislead the jury while offering little probative value. Accordingly, to the extent any portion of the report or proposed testimony would be admissible under Rule 702, the Court finds that it would be of minimal probative value, and, under Rule 403, the risk of confusing or misleading the jury substantially outweighs any potential probative value.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that *Defendants' Sivaraman Sambasivam's and David Gerald Minkkinen's Motion to Exclude the Report and Testimony of Walter Overby* (Document 192) be **GRANTED** and that the report and testimony of Walter Overby be **EXCLUDED** at trial.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendants and their respective counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER: June 26, 2023

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA