**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-4443**

---

UNITED STATES OF AMERICA,

> Plaintiff – Appellant,

v.

DAVID GERALD MINKKINEN; SIVARAMAN SAMBASIVAM,

> Defendants – Appellees.

---

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  Irene C. Berger, District Judge.  (2:22-cr-00163-1; 2:22-cr-00163-2)

---

Argued:  May 10, 2024                    Decided:  February 26, 2026

---

Before WYNN, RICHARDSON, and RUSHING, Circuit Judges.

---

Reversed and remanded by published opinion.  Judge Rushing wrote the opinion, in which Judge Wynn and Judge Richardson joined.

---

**ARGUED:**  Jennifer Rada Herrald, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellant.  Stephen S. Stallings, LAW OFFICES OF STEPHEN S. STALLINGS, ESQ., Pittsburgh, Pennsylvania; Rabea Jamal Zayed, DORSEY & WHITNEY LLP, Minneapolis, Minnesota, for Appellee.  **ON BRIEF:** William S. Thompson, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellant.  Nicole Engisch, DORSEY & WHITNEY LLP, Minneapolis, Minnesota; Susan M. Robinson, THOMAS COMBS & SPANN, PLLC, Charleston, West Virginia, for Appellee Sivaraman Sambasivam.

Michael Edward Nogay, SELLITTI, NOGAY & NOGAY, PLLC, Weirton, West Virginia, for Appellee David Gerald Minkkinen.

———————————

RUSHING, Circuit Judge:

Following a whistleblower complaint in 2016, the Government began investigating Defendants David Minkkinen and Sivaraman Sambasivam for potential intellectual property theft and fraud.  After a lengthy investigation, the Government indicted them around six years later.  By then, two relevant witnesses had died and three States had purged documents potentially relevant to the charged offenses.  Citing this missing evidence, Defendants moved to dismiss the indictment against them, alleging unconstitutional preindictment delay in violation of the Fifth Amendment's Due Process Clause.  The district court granted Defendants' motion in part, dismissing ten of the fourteen counts charged in the Government's superseding indictment.

The district court erred in concluding that it would violate the Due Process Clause to prosecute Defendants after the Government's preindictment delay, which was the result of its lengthy investigation and not tainted by bad faith.  Accordingly, we reverse and remand for further proceedings on all fourteen counts charged in the superseding indictment.

I.

A.

Between 2009 and 2013, Defendants worked for Deloitte, an international company offering "various financial and advisory services, including unemployment claims management services."  J.A. 761.  Relevant here, Deloitte developed and marketed "a proprietary web-based software platform named Unemployment Framework for Automated Claim & Tax Services ('uFACTS')," which it used "to process unemployment

insurance claims for state agencies" in Minnesota, Massachusetts, and New Mexico.[1]  J.A. 761.  Minkkinen was Deloitte's unemployment insurance practice leader, and Sambasivam was the "lead system architect" for uFACTS.  J.A. 762.

In 2013, Defendants left Deloitte to become senior partners in the newly launched unemployment insurance practice of another firm, Sagitec Solutions, LLC.  About two years later, Sagitec won a bid to design, develop, and implement a federally funded unemployment insurance claims software system for Maryland and West Virginia.  The parties call this project the Maryland–West Virginia Consortium, or the Consortium.  Minkkinen was Sagitec's primary point of contact for the project, and state employees worked with Sagitec and other subcontractors to develop and install the new software.

Starting in 2016, multiple West Virginia state employees began "notic[ing] suspicious references to Massachusetts, New Mexico, and Deloitte" in Sagitec's project materials.  J.A. 768.  One employee reported the suspicious references to West Virginia's Commission on Special Investigations, "alleging possible wrongdoing by Sagitec, to include the misappropriation of Deloitte intellectual property."  J.A. 768.

That summer, the United States Attorney's Office, the United States Department of Labor, the Maryland Attorney General's Office, and Deloitte learned about the whistleblower's complaint.  The Maryland Attorney General's Office sent Defendants letters relaying the whistleblower's concerns and asking specific questions about Sagitec's ownership of the materials being used for the Consortium.  Defendants consistently denied

---

[1] Deloitte's work with Minnesota stemmed from its predecessor's contract with the State.

wrongdoing.  Investigators also met with Deloitte representatives.  Those representatives stated that materials from previous consulting projects—i.e., the materials Defendants and Sagitec were allegedly using for their Consortium work—were not in the public domain. They also claimed that the States had "no ownership rights" in the software Deloitte developed for them; instead, the States held only "a license to use the software in perpetuity."  J.A. 447.

On February 3, 2017, the United States formally opened an investigation.  From 2017 to late 2019, the Government "conducted approximately 31 interviews and reviewed [a large number of] documents."  *United States v. Minkkinen*, 678 F. Supp. 3d 778, 793 (S.D. W. Va. 2023); *see id.* at 788 (acknowledging Government's representation that it "conduct[ed] a protracted and complex investigation involving voluminous discovery [and] witnesses in multiple states").[2]

Relevant here, in August 2017, investigators identified Bernt Peterson "as a source of design documents from Deloitte's New Mexico and Massachusetts projects that Sagitec possessed in connection with the Consortium project."  *Id.* at 785.  Peterson had worked on the Minnesota project as a state employee and the New Mexico project as a Deloitte employee.  He joined Sagitec in 2014.  After joining Sagitec, Peterson allegedly circulated the Deloitte design documents to other Sagitec employees.

---

[2] The district court noted that the Government "did not supply exhibits or testimony from investigators detailing the investigative timeline."  *Minkkinen*, 678 F. Supp. 3d at 793. The court therefore "relie[d] on the representations in [the Government's] brief, in combination with the other evidence submitted."  *Id.*  On appeal, Defendants do not object to the district court's reliance on the Government's representations about the investigation.

About a month later, in September 2017, investigators learned of Philip Tackett, another former Deloitte employee who worked on the New Mexico project.  Investigators became interested in Tackett after discovering his name in the metadata of hundreds of Consortium documents, which investigators suspected had been taken from Deloitte.  At the time investigators identified Tackett, he worked at IBM Corporation.

Tackett eventually joined Sagitec in May 2019, and investigators interviewed him under a grant of immunity in August of that year.[3]  Several statements from the interview are relevant here.  First, Tackett stated that when Deloitte's projects with state entities ended, "it's common that the software and all the deliverables, meaning the use cases, the test cases, . . . training documents, all those things, they become property of the State. . . . So New Mexico owned all" the materials generated by Deloitte for the New Mexico project.[4]  J.A. 646.  But when asked in a follow-up question whether New Mexico owned the materials from its project or whether the State was instead "licensed to use" them, Tackett responded: "That I don't know."  J.A. 646.  Tackett clarified that he "certainly had no expectation or understanding" that he—an employee—"owned any of that."  J.A. 646.

Next, when asked why his name appeared in some of the documents' metadata, Tackett explained that several documents dealt with subjects he had never worked on and that other documents implausibly indicated he "printed" them during the time he was at

---

[3] An excerpted transcript of Tackett's interview is in the record.  *See* J.A. 646–650.

[4] A "use case" is a "written document" that "describes how . . . [a] software system . . . is going to function."  J.A. 868.  It can have "diagrams, schematics, [and] screen captures."  J.A. 868.  Once use cases are finalized, programmers use them to write software programs.

IBM—not Deloitte or Sagitec.  J.A. 650.  Further, when asked about similarities between some Deloitte and Sagitec materials, Tackett claimed that the similarities reflected Minkkinen's preferences and methods for managing a project.  He also remarked that some of the materials with Deloitte's name in the metadata "[c]ould have" come from the New Mexico project, but he maintained that he "really [couldn't] say" one way or the other.  J.A. 647.

A few months after Tackett's interview, in December 2019, the Government informed Sagitec that it was the target of a criminal investigation.  After a proffer from the Government in February 2020, Sagitec agreed to conduct its own internal investigation.  Meanwhile, in March 2020, Tackett "passed away unexpectedly."  J.A. 652.  Sagitec's internal investigation concluded in October of that year, and it "prompted additional questions and leads" for the Government to pursue.  J.A. 663.

In November 2020—one month after Sagitec finished its internal investigation— investigators interviewed Peterson.[5]  Peterson confirmed working on the Massachusetts and New Mexico projects, as well as writing use cases and supervising others who wrote use cases while working on the Consortium at Sagitec.  He stated that he did not remember any "references to other states" in the materials he worked on.  J.A. 630.  But he did admit to taking use case documents from the New Mexico (and possibly the Massachusetts)

---

[5] Peterson's interview was recorded, but the recording was not submitted to the district court.  Thus, like the district court, we "rel[y] on the Memorandum of Interview and synopsis" in the record, *Minkkinen*, 678 F. Supp. 3d at 785 n.4, although we note the synopsis "does not purport to be an exact transcription of what was said during the course of the interview," J.A. 626.

project when he left Deloitte.  He explained that he used the old use case materials only as a template for the Consortium's work.  In other words, he claimed that he would scrub the documents' contents while retaining the format, and then tell his subordinates to use the formatted document to create a use case for the Consortium.  As far as he was aware, no one had access to the substance of the use case materials he brought from Deloitte.  And he had "no idea" if anyone else took any materials from Deloitte.  J.A. 634.  Peterson stated that use cases are inherently individualistic and thus of no use to competitors, and he opined that the materials he took from Sagitec when he went to work at another firm were "Sagitec's property" or "Sagitec's project."  J.A. 632.

After the Government made a proffer to Peterson about his potential criminal exposure, Peterson agreed to conduct a follow-up interview scheduled for December 15, 2020.  On December 13, 2020, however, Peterson "died unexpectedly."  J.A. 636.

That same month, the Government served Minkkinen with a target letter.  In March 2021, the Government interviewed Sambasivam, served him with a target letter, and made a proffer to Minkkinen.  In April, it made a proffer to Sambasivam.  Over the months that followed, the parties "engaged in several additional communications," and the Government continued to review evidence, including newly produced documents.  *Minkkinen*, 678 F. Supp. 3d at 787.  The last witness interview occurred on July 21, 2022, about one month before the indictment was returned.

### B.

Defendants were indicted on August 23, 2022.   Both were charged with misappropriating trade secrets and conspiring to misappropriate trade secrets in violation

8

of 18 U.S.C. § 1832(a)(1), (2), (3), and (5).  In addition, Minkkinen was individually charged with wire fraud in violation of 18 U.S.C. § 1343 and several counts of false statements in violation of 18 U.S.C. § 1001.  Sambasivam was also individually charged with two counts of false statements.

Following the indictment, Defendants subpoenaed various third parties, including Deloitte, Sagitec, and the States that Deloitte had contracted with to develop unemployment software solutions.  Notable here, the relevant Minnesota agency responded with a letter stating Defendants sought documents from a project that concluded in 2008 and had since been "repeatedly modified."  J.A. 142–143.  According to the agency, its "designated retention period for most [documents] is 11 years or shorter, with many [documents] retained for 3, 6, or 7 years."  J.A. 143.  "The retention period for contracts and related documents is 6 years."  J.A. 143.  The agency explained that "in connection with" the end of each retention period and "specifically, the [agency's office] move completed in May 2022, concerted efforts were made" to destroy any documents no longer within the applicable retention periods.  J.A. 143.  "As such, as of May 2022, documents prior to 2011 and many others to which shorter retention periods applied, were securely destroyed."  J.A. 143.  That said, the Minnesota agency explained that there was "current staff with knowledge of or involvement in" the relevant unemployment insurance project and produced one hundred pages of documentation relevant to Defendants' requests, including various contract components, some executed and some not.  J.A. 143–144.

Though the record is less clear about documents related to the New Mexico and Massachusetts projects, neither State was able "to provide full responses" to Defendants'

subpoenas "because many documents and communications were no longer available." *Minkkinen*, 678 F. Supp. 3d at 787–788.

After the Government clarified that its trial evidence would focus on alleged trade secrets related to Massachusetts uFACTS source code and Massachusetts and New Mexico uFACTS project design documentation, Defendants moved to dismiss the indictment on grounds of unconstitutional preindictment delay. They argued that the Government's preindictment delay prejudiced their defense because the delay resulted in the unavailability of key testimony from Peterson and Tackett, as well as material documents from state agencies. The Government opposed the motion.

Before the district court ruled, the Government filed a superseding indictment, dropping the count for substantive trade secret theft and adding several wire fraud counts. All said, the superseding indictment charged both Defendants with conspiracy to misappropriate trade secrets in violation of 18 U.S.C. § 1832(a)(5); conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343, 1349; and several counts of aiding and abetting wire fraud in violation of 18 U.S.C. §§ 2, 1343. Minkkinen was also charged with seven counts of making false statements in violation of 18 U.S.C. § 1001, and Sambasivam was charged with two. In the main, the superseding indictment alleged that before, during, and after transitioning from Deloitte to Sagitec, Defendants illegally "copied, downloaded, obtained, and transmitted numerous Deloitte files, including highly proprietary information such as uFACTS source code, data, and use cases," without Deloitte's authorization. J.A. 763. And those "files were subsequently used by numerous Sagitec employees to design,

develop, and market" the software Sagitec was hired to develop for the Consortium.  J.A. 763.

After the superseding indictment, the district court received supplemental briefing from the parties and then granted Defendants' motion to dismiss in part.  The court found that Peterson's and Tackett's testimony would have been "highly significant" and "valuable" to the defense.  *Minkkinen*, 678 F. Supp. 3d at 791–792.  It also concluded that the documents destroyed by the state agencies would have been "highly valuable" and "highly probative."  *Id.* at 792.  In combination, the missing evidence "could change the outcome of a trial."  *Id.* at 793.  The district court found that the Government's "prolonged investigation" was the reason for the delay but that the Government offered "little explanation for the length of the investigation."  *Id.* at 794.  Judging the Government's "justification for the length of the investigation" to be "insufficient in light of the extent of the prejudice caused by the delay," the court concluded that prosecution on the affected counts would violate the Due Process Clause.  *Id.*  It therefore dismissed ten of the fourteen counts charged in the superseding indictment.  *See id.* at 795–797.

The Government timely appealed, and we have jurisdiction under 18 U.S.C. § 3731.

## II.

"[S]tatutes of limitations . . . provide 'the primary guarantee[] against . . . overly stale criminal charges.'"  *United States v. Lovasco*, 431 U.S. 783, 789 (1977) (quoting *United States v. Marion*, 404 U.S. 307, 322 (1971)).  Even so, the Supreme Court has instructed that "the Due Process Clause has a limited role to play in protecting against oppressive [preindictment] delay."  *Id.*  It is "possible for an indictment within the statute

11

of limitations to raise due process concerns," but "a defendant raising such a challenge faces a high burden." *United States v. Palmer*, 159 F.4th 221, 226 (4th Cir. 2025).

This Court evaluates claims of unconstitutional preindictment delay under "a two-pronged inquiry." *United States v. Uribe-Rios*, 558 F.3d 347, 358 (4th Cir. 2009). "First, we ask whether the defendant has satisfied his burden of proving 'actual prejudice'" from the delay. *Id*. (quoting *United States v. Automated Med. Lab'ys, Inc.*, 770 F.2d 399, 403 (4th Cir. 1985)). "'This is a heavy burden because it requires not only that a defendant show actual prejudice, as opposed to mere speculative prejudice, but also that he show that any actual prejudice was substantial—that he was meaningfully impaired in his ability to defend against the state's charges to such an extent that the disposition of the criminal proceeding was likely affected.'" *United States v. Shealey*, 641 F.3d 627, 633–634 (4th Cir. 2011) (quoting *Jones v. Angelone*, 94 F.3d 900, 907 (4th Cir.1996)).

"Second, if that threshold requirement is met, we consider the government's reasons for the delay, 'balancing the prejudice to the defendant with the Government's justification for delay.'" *Uribe-Rios*, 558 F.3d at 358 (quoting *Automated Med. Lab'ys*, 770 F.2d at 404). "'The basic inquiry'" under this prong is "'whether the government's action in prosecuting after substantial delay violates fundamental conceptions of justice or the community's sense of fair play and decency.'" *Jones*, 94 F.3d at 904 (quoting *Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990)); *see also id.* at 910.

We need only address the second prong of the analysis to resolve this appeal. On the first prong, Defendants claim prejudice from the loss of two kinds of evidence: (1) Peterson's and Tackett's testimony, and (2) the state agency documents allegedly

12

relevant to past Deloitte projects. We can accept for the sake of argument the district court's finding that the loss of this evidence actually and substantially prejudiced Defendants' defense.[6] For even if that's the case, the district court erred in concluding that the Government's action in prosecuting Defendants violated the Due Process Clause. *See*, *e.g.*, *Jones*, 94 F.3d at 910 (concluding defendant failed to satisfy the second prong of the due process analysis "[e]ven if [he] had established that he was actually and substantially prejudiced"); *Automated Med. Lab'ys*, 770 F.2d at 403 ("[W]hile proof of actual prejudice makes a due process claim concrete and ripe for adjudication, it does not automatically make the claim valid.").

---

[6] Though we assume without deciding that Defendants have shown actual, substantial prejudice, we pause to note that the district court's reasoning on this score was deficient.

To begin, when the "'claimed prejudice is the unavailability of [a] witness[],' the defendant must . . . 'show that the information the witness would have provided was not available from other sources.'" *Palmer*, 159 F.4th at 227 (quoting *Jones*, 94 F.3d at 908). Logically, the same rule applies to lost documents. Yet the district court did not require this showing and made no findings about whether other sources could provide the information conveyed by Peterson's and Tackett's witness interviews and the unspecified state agency documents.

In addition, the district court found substantial prejudice based on the lost documents even though Defendants never explained what any of the documents (save one) would have said. Proof of prejudice must be actual and definite, not "speculative." *Jones*, 94 F.3d at 907. Yet Defendants merely claimed, without any specificity, that some unidentified documents were "*potentially* exculpatory." J.A. 420 (emphasis added).

The one document Defendants did identify was a contract Deloitte employees signed before beginning work on the Massachusetts project, which stated that project deliverables belonged to Massachusetts. Although Defendants obtained an *unsigned* copy of the contract, the district court found prejudice from the loss of *signed* copies. Generally, loss of "the best means of proving [Defendants'] contentions" is not actual prejudice when Defendants possess other means to present their defense. *United States v. Cederquist*, 641 F.2d 1347, 1351–1352 (9th Cir. 1981) (holding that district court erred in finding actual prejudice from missing documents when witnesses could testify concerning the information).

A.

Before evaluating the merits of the district court's due process analysis, we pause to identify the standard of review. As we have often repeated when considering claims of preindictment delay, "[w]e review the district court's factual findings for clear error and its conclusions of law de novo." *Palmer*, 159 F.4th at 226; *see United States v. Villa*, 70 F.4th 704, 715 (4th Cir. 2023). Both prongs of the preindictment delay inquiry, however, may involve review of factual findings and legal conclusions, so discerning the nature of the precise question before us is important.

We conclude that the question we address here—whether a prosecution "violates fundamental conceptions of justice or the community's sense of fair play and decency"— presents a mixed question of law and fact subject to de novo review. *Automated Med. Lab'ys*, 770 F.2d at 404 (internal quotation marks omitted). A mixed question asks "whether the historical facts found satisfy the legal test chosen." *U.S. Bank Nat'l Ass'n ex rel. CWCap. Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 394 (2018). The second prong of the preindictment delay inquiry does just that. It requires a court to determine whether, considering the court's findings about the justification for the government's delay and the prejudice to the defendant, the prosecution comports with the relevant legal standard, that is, "fundamental conceptions of justice or the community's sense of fair play and decency." *Jones*, 94 F.3d at 910 (internal quotation marks omitted).

The standard of review for a mixed question depends on "whether answering it entails primarily legal or factual work." *U.S. Bank*, 583 U.S. at 396. Generally, where the mixed question "require[s] courts to expound on the law, particularly by amplifying or

14

elaborating on a broad legal standard," de novo review is appropriate. *Id.* (citing *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231–233 (1991)). Where the question "immerse[s] courts in case-specific factual issues," more deferential review applies. *Id.* (citing *Pierce v. Underwood*, 487 U.S. 552, 561–562 (1988)). "In the constitutional realm," however, "the calculus changes." *Id.* at 396 n.4. "There, [the Supreme Court has] often held that the role of appellate courts 'in marking out the limits of [a] standard through the process of case-by-case adjudication' favors *de novo* review even when answering a mixed question primarily involves plunging into a factual record." *Id.* (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 503 (1984), and collecting cases).

The mixed question at the second prong of the preindictment delay inquiry requires courts to expound on a broad constitutional standard; therefore, de novo review is most appropriate. It's hard to imagine a broader standard than one focused on "fundamental conceptions of justice or the community's sense of fair play and decency." *Jones*, 94 F.3d at 910 (internal quotation marks omitted). And this broad standard is also a constitutional one, making de novo review even more fitting. *See Bose Corp.*, 466 U.S. at 503 ("When the standard governing the decision of a particular case is provided by the Constitution, [appellate courts'] role in marking out the limits of the standard through the process of case-by-case adjudication is of special importance."); *Lovasco*, 431 U.S. at 790 (drawing the due process standard for preindictment delay from *Rochin v. California*, 342 U.S. 165,

173 (1952), and *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).[7]   Accordingly, we will review de novo the district court's determination that, balancing the justification for the delay and the prejudice caused by it, trial on the dismissed counts would violate Defendants' due process rights.   *Accord Shealey*, 641 F.3d at 634 ("This court reviews legal issues, including claims of due process violations, de novo." (internal quotation marks omitted)); *United States v. Harvel*, 115 F.4th 714, 727 (6th Cir. 2024) (reviewing the district court's "findings about historical facts under the deferential clear-error standard but giv[ing] fresh (de novo) review to its ultimate holding that the government did not violate due process").

## B.

Having settled the standard of review, we now turn to the merits.   At the second prong of the preindictment delay analysis, we consider whether, balancing Defendants' prejudice against the Government's justification for the delay, the Government's action in prosecuting after such delay "violate[s] fundamental conceptions of justice or the community's sense of fair play and decency."   *Jones*, 94 F.3d at 910 (internal quotation marks omitted).   The district court found, and Defendants do not dispute, that the Government's delay was the product of a "prolonged investigation" untainted by any "improper motive."   *Minkkinen*, 678 F. Supp. 3d at 794.

---

[7] The Supreme Court has also "asked whether there is 'a long history of appellate practice' indicating the appropriate standard" of review.   *Monasky v. Taglieri*, 140 S. Ct. 719, 730 (2020) (quoting *Pierce*, 487 U.S. at 558).   Here, caselaw does not reveal a "uniform, reasoned practice" concerning the standard of review for the second prong of the preindictment delay inquiry.   *Id.*

The Supreme Court has squarely "h[e]ld that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Lovasco*, 431 U.S. 796; *see id.* (finding no due process violation from preindictment delay despite the death of two witnesses, where "the only reason the Government postponed action was to await the results of additional investigation"). We have adhered to the Supreme Court's holding in our own decisions, reiterating that "investigative delay, as opposed to intentional delay undertaken to gain tactical advantage, would not violate due process." *Howell*, 904 F.2d at 894–895; *see also*, *e.g.*, *Uribe-Rios*, 558 F.3d at 358 ("If delay results from a protracted investigation that was nevertheless conducted in good faith, the Supreme Court has held that 'to prosecute a defendant following investigative delay does not deprive him of due process . . . .'" (quoting *Lovasco*, 431 U.S. at 796)).

By contrast, the Due Process Clause "requires the dismissal of an indictment . . . if the defendant can prove that the Government's [prejudicial] delay in bringing the indictment was a deliberate device to gain an advantage over him." *United States v. Gouveia*, 467 U.S. 180, 192 (1984). "[A] due process violation [might also] be made out 'upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense.'" *Howell*, 904 F.2d at 895 n.9 (quoting *Lovasco*, 431 U.S. at 795 n.17). And this Court has found a due process violation when the prosecution admitted it "was 'negligent' in not prosecuting the defendant earlier," was

17

not "engaged in preindictment investigation," and caused actual prejudice to the defendant for "mere convenience." *Id.* at 895.[8]

As the Supreme Court has explained, "investigative delay is fundamentally unlike delay undertaken" for tactical advantage or other reasons, "because investigative delay is not so one-sided." *Lovasco*, 431 U.S. at 795. Prosecutors are not "constitutionally obligated to file charges against a suspect as soon as they have probable cause" or "as soon as they marshal enough evidence to prove guilt beyond a reasonable doubt but before their investigations are complete." *Gouveia*, 467 U.S. at 192 n.7. To hold otherwise would "prevent[] society from bringing lawbreakers to justice," would "pressure prosecutors into resolving doubtful cases in favor of early—and possibly unwarranted—prosecutions," and would "preclude the Government from giving full consideration to the desirability of not prosecuting in particular cases." *Lovasco*, 431 U.S. at 792–794. A prosecutor who "refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt" abides by the "standards of 'fair play and decency'" rather than deviating from them. *Id.* at 795. Accordingly, the Due Process Clause is not offended when prosecutors "defer action for [investigatory] reasons." *Id.*

The district court erred in concluding that the Government's investigative preindictment delay violated the Due Process Clause. In the court's view, (1) the

---

[8] Unlike most circuits, this Court does not require defendants alleging preindictment delay to show "that 'the government intentionally delayed the indictment to gain an unfair tactical advantage or for other bad faith motives.'" *Jones*, 94 F.3d at 905 (quoting *United States v. Crooks*, 766 F.2d 7, 11 (1st Cir. 1985) (Breyer, J.), and collecting cases).

Government's explanation of its investigatory activities did not justify "the length of the investigation" and (2) the Government's justification was "insufficient in light of the extent of the prejudice caused by the delay." *Minkkinen*, 678 F. Supp. 3d at 794. Neither reason supports dismissal of the charges for unconstitutional delay.

First, regarding the length of the investigation, the district court's own reconstruction of the investigative timeline shows that the Government's good faith investigation accounts for the entire period of preindictment delay. The Government became aware of the allegations against Sagitec in the summer of 2016, and it opened a formal investigation only months later in February 2017. *Id.* at 793. From then until December 2019, the Government conducted approximately 31 interviews and reviewed a large number of documents. *Id.* at 793–794. In December 2019, the Government informed Sagitec that it was the target of a criminal investigation, and in February 2020 the Government made a proffer to the company. *See id.* at 787, 794.

Sagitec then undertook an internal investigation that lasted approximately one year, and in the meantime the Government continued its work and interviewed Sagitec employees. *Id.* at 787, 794 & n.10. Sagitec's investigation "prompted additional questions and leads for investigation," which the Government pursued. J.A. 663. Investigators interviewed Peterson in November 2020 and made a proffer to him one month later. The Government informed Minkkinen that he was a target that same month (December 2020) and informed Sambasivam that he was a target in March 2021.

Throughout 2021, the Government "engag[ed] in pre-indictment discussions" with Defendants' counsel. *Minkkinen*, 678 F. Supp. 3d at 794. These included proffers of

19

evidence in March and April, a video conference with a defense expert in June, phone conversations with defense counsel, and a meeting with defense counsel in December 2021. Investigators also "continued reviewing emails turned over by Sagitec" during this time and conducted more interviews. *Id.* The last witness interview occurred on July 21, 2022, about one month before the original indictment. *Id.*

As the district court's timeline shows, no portion of the preindictment delay is left unaccounted for by the Government's good faith investigative efforts. Of course, the Government has not explained what occurred on every single day in the relevant period. But such a detailed explanation is not required. Indeed, the Supreme Court has rejected a standard that would require prosecutors "to trace the day-by-day progress of each investigation" for district courts, as though the "courts were required to decide . . . when the prosecution should have commenced." *Lovasco*, 431 U.S. at 793 n.14. To the contrary, "the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment." *Id.* at 790.

The preindictment delay here, though lengthy, is entirely attributable to the Government's good faith investigation. Prosecuting Defendants after this "investigative delay does not deprive [them] of due process." *Id.* at 796; *see id.* (finding no due process violation where "the only reason the Government postponed action was to await the results of additional investigation"); *United States v. Lopez*, 860 F.3d 201, 213 (4th Cir. 2017) (finding no due process violation where six-year delay was "a result of continued reasonable investigation"); *United States v. McKoy*, 129 Fed. App. 815, 819 (4th Cir. 2005)

(finding no due process violation when additional investigation was a "legitimate need for the delay"). Though "[t]he wheels of government bureaucracy may, at times, seem to turn at a frighteningly slow pace," "careful investigation and consideration prior to the bringing of criminal charges" accord with fair play and decency. *Automated Med. Lab'ys*, 770 F.2d at 404.

Second, the district court reasoned that the Government's investigation could not justify the delay because the "'actual prejudice . . . is substantial.'" *Minkkinen*, 678 F. Supp. 3d at 794 (quoting *Automated Med. Lab'ys*, 770 F.2d at 404). That conclusion stands in tension with our "two-pronged inquiry" for evaluating preindictment delay. *Uribe-Rios*, 558 F.3d at 358. The first prong requires a defendant to prove "actual substantial prejudice." *Jones*, 94 F.3d at 907; *see Shealey*, 641 F.3d at 633–634; *Marion*, 404 U.S. at 324. But actual substantial prejudice is not sufficient; the court must consider the reasons for the delay as well to determine whether prosecution after such delay violates "fundamental conceptions of justice or the community's sense of fair play and decency." *Jones*, 94 F.3d at 910 (internal quotation marks omitted); *see Lovasco*, 431 U.S. at 790. And "a protracted investigation . . . conducted in good faith" can justify even a delay that results in actual substantial prejudice. *Uribe-Rios*, 558 F.3d at 358; *see Lovasco*, 431 U.S. at 796; *Howell*, 904 F.2d at 894–895.

In reaching its conclusion, the district court relied on this Court's decision in *Automated Medical Laboratories*. There, the Government attributed the delayed indictment to "the lengthy administrative review process at the FDA," "the time required for Government attorneys to become familiar with a complex case," "manpower problems"

21

in the prosecutor's office, and, in part, "additional investigative activities."  770 F.2d at 404.  This Court stated: "While such reasons may not suffice where the actual prejudice to the defendant from the delay is substantial, we find that there is no due process violation when these reasons are considered in light of the slight, possibly nonexistent prejudice suffered by [the defendant]."  *Id.*  From this statement, the district court reasoned that, because the prejudice here *was* substantial, the Government's investigation could *not* suffice to justify the delay.

*Automated Medical Laboratories* does not stand for that proposition.  For one, the Court did not hold that the government's reasons for the delay in that case would not suffice if the prejudice were substantial but simply allowed that those reasons "*may* not suffice" in such circumstances, which were not presented there.  *Id.* (emphasis added); *see also Payne v. Taslimi*, 998 F.3d 648, 654–655 (4th Cir. 2021) (defining dicta).  Moreover, the Government's reasons for the delay in *Automated Medical Laboratories*—which included "manpower problems" and a noncriminal regulatory process, 770 F.2d at 404—do not match the reason for the delay here, a sustained criminal investigation involving "voluminous discovery" and numerous "witnesses in multiple states," *Minkkinen*, 678 F. Supp. 3d at 788.  For these reasons, the district court's reliance on *Automated Medical Laboratories* was misplaced.

At bottom, the district court's analysis would compel the Government to seek an indictment before its investigation was complete.  Due process does not require that result.  *See Lovasco*, 431 U.S. at 790; *Gouveia*, 467 U.S. at 192 n.7.  There has been "no showing that the Government intentionally delayed to gain some tactical advantage over

[Defendants] or to harass them," *Marion*, 404 U.S. at 325, or that the Government acted recklessly or for "mere convenience" in not concluding its investigation sooner than it did, *Howell*, 904 F.2d at 895 & n.9. Rather, the district court's own factual findings establish a timeline showing that the Government's good faith investigative efforts continued until at least one month before the indictment was returned. Even assuming Defendants have proven actual substantial prejudice to their defense, requiring them to stand trial after the Government delayed indictment to investigate further does not violate "fundamental conceptions of justice or the community's sense of fair play and decency." *Jones*, 94 F.3d at 904 (internal quotation marks omitted).

III.

For the foregoing reasons, we reverse the district court's order dismissing ten of the fourteen counts charged in the superseding indictment, and we remand the case for further proceedings on all fourteen counts.

*REVERSED AND REMANDED*