**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v. CRIMINAL ACTION NO. 2:22-cr-00163

DAVID GERALD MINKKINEN,
SIVARAMAN SAMBASIVAM,

Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *Defendant Sivaraman Sambasivam's Motion to Suppress Evidence Obtained by West Virginia Commission on Special Investigations Through Illegal Searches Using Confidential Informant* (Document 150), *Defendant David Minkkinen's Motion to Suppress Evidence Obtained by West Virginia Commission on Special Investigations Investigator Jim Powers Through Confidential Informant Greg Keene* (Document 151), the *Government's Opposition to Defendants' Motion to Suppress (Dkt. 150 and 151)* (Document 158), the *Defendant Sivaraman Sambasivam's Reply in Support of Motion to Suppress Evidence Obtained by West Virginia Commission on Special Investigations Through Illegal Searches Using Confidential Informant* (Document 165), and the attached exhibits. The Court held a hearing on the matter and heard testimony on July 29, 2026, and on August 24, 2026. The Court has considered the testimony and exhibits introduced during the hearing, as well as those submitted with the parties' briefs. For the reasons stated herein, the Court finds that each of the Defendants' motions to suppress should be granted.

## ALLEGATIONS IN THE SUPERSEDING INDICTMENT

The Defendants, Sivaraman Sambasivam and David Gerald Minkkinen, were indicted in a multi-count *Superseding Indictment* (Document 186). As to Defendant Sambasivam, the indictment charges that he has violated 18 U.S.C. § 1832(a)(5) (Conspiracy to Steal Trade Secrets), 18 U.S.C. §§ 1343 and 1349 (Conspiracy to Commit Wire Fraud), 18 U.S.C. §§ 1343 and 2 on three occasions (Wire Fraud and Aiding and Abetting Wire Fraud), and twice violated 18 U.S.C. § 1001(a)(2) (Making of a False Statement). As to Defendant David Minkkinen, the indictment charges that he has violated 18 U.S.C. § 1832(a)(5) (Conspiracy to Steal Trade Secrets), 18 U.S.C. §§ 1343 and 1349 (Conspiracy to Commit Wire Fraud), 18 U.S.C. §§ 1343 and 2 on three occasions (Wire Fraud and Aiding and Abetting Wire Fraud), and seven times violated 18 U.S.C. § 1001(a)(2) (Making of a False Statement).

Generally, the indictment alleges the following:

Deloitte owned and marketed a web-based software platform, Unemployment Framework for Automated Claim & Tax Services (uFACTS). This software platform was used to process unemployment claims for state agencies. The platform's "source code, database, data tables, use cases, software designs, business rules, schema, logic, artifacts, and architecture constituted Deloitte intellectual property." (Superseding Indictment ¶ 1.) This uFACTS platform had been implemented in Minnesota, New Mexico, and Massachusetts. The Defendants were employed by Deloitte, with Defendant Minkkinen as the Unemployment Insurance Practice Leader and Defendant Sambasivam as the lead system architect for the uFACTS Solution Framework.

Between June 2013 and December 2015, eleven employees left Deloitte and began to work for Sagitec Solutions, LLC, which also had an Unemployment Insurance practice. Mr. Minkkinen

and Mr. Sambasivam separately left Deloitte and joined Sagitec in 2013. In their employment contracts with Deloitte, the Defendants agreed not to disclose any of Deloitte's proprietary property to third parties or retain the property. Defendant Minkkinen also was reminded through a resignation checklist that he was not to copy client or Deloitte information, and he was to return all records that he had checked out or were a work in progress. (*Id.* ¶ 8.)

However, pursuant to an agreement between the Defendants, first Defendant Minkkinen, and then Defendant Sambasivam, copied and downloaded several pieces of Deloitte proprietary information, including the uFACTS source code, data, and use cases, without authorization.[1] For example, between 2013 and 2015, one or both of the Defendants copied or transferred to Sagitec an executive summary of Deloitte's response to a request for proposal, a marketing brochure, Deloitte's uFACTS related fraud detection deliverables for Wisconsin and Minnesota, use case documents from Deloitte's Massachusetts uFACTS project, the uFACTS Oracle database, the uFACTS Data Definition Language, a 227-page document titled the "uFACTS Solution Framework," and a spreadsheet titled "Deloitte Consulting Project Pricing Model." The information was mostly transmitted over email, sometimes between the two Defendants, and other times including other Sagitec employees. In addition to the information sent by the Defendants, there are emails sent by Sagitec employees to the Defendants, discussing additional information regarding Deloitte's uFACTS software, including the uFACTS code base and use cases.

Until on or about September 20, 2013, Defendant Sambasivam had been employed by Deloitte, but was communicating with Sagitec employees including Defendant Minkkinen, about the uFACTS software. While still employed by Deloitte, Defendant Sambasivam emailed both a

[1] More specific instances and examples of the copying and transmission of information from Deloitte are included in the Superseding Indictment ¶¶ 11-31.

link and corresponding login information to a Sagitec employee for Deloitte's Massachusetts project.

In or about 2015, Sagitec was awarded a contract to design and develop an unemployment insurance benefit claim software system for the states of Maryland and West Virginia. The interests of the two states were combined into the Maryland-West Virginia Consortium (Consortium). In Sagitec's contract with the Consortium, signed by Defendant Minkkinen, Sagitec agreed that its work product would not infringe on the proprietary rights of a third party. The money to fund the project was provided by federal grants from the United States Department of Labor.

To complete the project, Sagitec employees worked with state employees from West Virginia and Maryland. In 2016, West Virginia state employees noticed that there were references to Massachusetts, New Mexico, and Deloitte within the project materials used by Sagitec. After seeing these references, Greg Keene with WorkForce West Virginia contacted the West Virginia Commission on Special Investigations. Upon learning of this complaint, a Maryland Assistant Attorney General (MD AAG) sent a letter to Defendant Minkkinen, raising concerns about the project including references to Massachusetts within Sagitec's documents. On or about July 25, 2016, Defendant Minkkinen replied to the MD AAG with a letter drafted with the help of Defendant Sambasivam, which said that references to other states were innocent, and due to Sagitec using them as examples "to discuss potential implementation options" for West Virginia and Maryland. (*Id.* ¶ 34.) The Defendants made these statements despite their preexisting knowledge and firm belief that Deloitte considered the relevant information to constitute trade secrets and that they had been using that information.

In reply, the MD AAG sent a follow-up letter to Defendant Minkkinen asking, in part, whether any Sagitec employees had "retained . . . any software, source code, data tables, data structures, data dictionaries, documentation, deliverables, or other works" belonging to Deloitte, or had incorporated such items into any work delivered to the Consortium. (*Id.* ¶ 35.) In a response to this questionnaire, prepared by both Defendants, and signed by Defendant Minkkinen, it was denied that any Sagitec personnel had ever retained any of the listed information or had incorporated it into their work for the Consortium. This position was again stated by Defendant Minkkinen during a November 10, 2016 meeting with officials from Maryland's Department of Labor, Licensing, and Regulation.

Upon learning of a criminal investigation, Defendant Minkkinen sent copies of the response letters written to the MD AAG to the investigators in West Virginia and Virginia. During later interviews by an investigating agent in Charleston, West Virginia, both Defendants continued to deny any retention or use of Deloitte's information.

The Defendants have continued to repeatedly deny any improper use of Deloitte's uFACTS software. For example, Deloitte began accusing Sagitec of theft of trade secrets in 2016. Relying on statements made by the Defendants, Sagitec's counsel denied Deloitte's accusations.[2] In response to a later follow-up letter from Deloitte, with the assistance of the Defendants, Sagitec again denied that they had obtained any Deloitte proprietary materials.

**FACTUAL FINDINGS**

In 2015, Sagitec won a bid to design, develop, and implement an unemployment insurance software system for the states of Maryland and West Virginia, funded by the United States

[2] Deloitte brought a now-settled civil claim for theft of trade secrets, specifically related to the uFACTS software, against Sagitec. *Deloitte Consulting LLP et al v. Sagitec Solutions LLC*, 1 :23-cv-325 (D. De. 2023).

Department of Labor. As a result, Sagitec contracted with the Consortium, a collective entity for Maryland and West Virginia. Sagitec used a Microsoft Azure subscription product to manage the technical infrastructure for the Consortium Project, and it controlled the subscription. Sagitec managed the technical infrastructure, including controlling access to the networks, servers, and clouds.

Members of the project would be working from several different states, and to coordinate development, Sagitec established a virtual workplace called the "Consortium Project SharePoint Site" (SharePoint Site). The SharePoint Site contained Consortium Project work product, materials, and deliverables. The SharePoint site was secured, with strictly limited access, and approved users had to gain access through a VPN server and entry of their username and password. Sagitec provided access to the SharePoint site and other virtual work environments based on the individual's role within the project. Approximately 9-13 people, in total, at Sagitec had authority to grant credentials to the SharePoint sites and to the Sandbox. (Supp. Hr'g Tr. at 100:18.) Infrastructure cloud engineers at Sagitec would generate usernames and passwords on an individual basis. They would either create an account or add the individual to a group that already existed, with a specified level of access. Access to specific libraries, folders, or individual files within SharePoint could be restricted. Mr. Sambasivam, as the project lead, was in charge of determining who should be granted access and the extent of access for each individual, although he could delegate that authority to permit managers or system architects to approve access. Clients, including West Virginia and Maryland, could not directly create accounts or provide usernames or passwords to employees working on the Consortium Project.

Mr. Sambasivam and Mr. Minkkinen were each management employees at Sagitec and had leadership roles on the Consortium Project. Their positions allowed them to personally control access to the virtual workspaces. Their roles also involved consistent work within those workspaces over the entire span of the Consortium Project. In addition, both had significant ownership interest in Sagitec: Mr. Minkkinen had a 20% membership interest, and Mr. Sambasivam had a 10% membership interest.

West Virginia and Maryland had separate Azure subscriptions and separate virtual work sites, such that Maryland employees would not have access to the SharePoint site associated with the West Virginia project and vice versa. The SharePoint Site was further broken into "areas" (e.g., Design Documentation and Project Management). Employees and contractors of Sagitec, the Maryland Department of Labor, and WorkForce West Virginia were given "basic access" to the SharePoint Site, as "Team Members." They could download documents from SharePoint and upload documents to SharePoint. While exact numbers were unavailable, a Sagitec employee testified that the Maryland SharePoint site had more users than the West Virginia site, with approximately 100 users at the peak shortly before the program went online.[3] Within Sagitec's virtual workplace was also the "Sandbox Environment" which contained the source code for the Consortium Project. Access to the Sandbox Environment was even more strictly limited, and fewer than ten employees of the Consortium states had access to the source code.

One of the employees with WorkForce West Virginia was Greg Keene, who was a programmer and analyst for the tax and wage systems at WorkForce. His job duties included

[3] West Virginia had left the Consortium prior to implementing the software and did not have a final implementation period with an associated increase in users. Thus, it is safe to conclude that substantially fewer than 100 users had access to the West Virginia SharePoint site.

work on the Consortium Project beginning in early 2016. Informant Keene was a supervisor for the tax and wage systems at WorkForce, and his role for the Consortium involved data conversion for the tax and wage components of the system.

Informant Keene had a pre-existing relationship with Jim Powers of the West Virginia Commission on Special Investigations[4] because he had served as an informant in a previous case. Their relationship began in 2010 in relation to Informant Keene's allegations of public corruption, and they had additional contact over the years based on Investigator Powers' law enforcement role. In May 2016, Informant Keene reached out to Investigator Powers to inform him that he believed that Sagitec was engaged in some level of fraud in its work on the Consortium Project, including the use of foreign labor.[5] Informant Keene met with Investigator Powers in late June 2016 and provided him with a thumb drive with documents to illustrate his concerns.[6] Investigator Powers opened an investigation in response to Informant Keene's concerns, which he kept covert until August 2018, leaving WorkForce West Virginia Management, as well as Sagitec, unaware of the investigation. Investigator Powers did begin consulting with Assistant United States Attorney Andrew Cogar of the Northern District of West Virginia early in the investigation, and investigators from the Department of Labor, which funded the Consortium, participated in the investigation.

---

[4] The West Virginia Commission on Special Investigations is an investigative body of the West Virginia Legislature empowered to investigate fraud, corruption, and violations of law or policy related to state agencies, government officials, and government contracting. W. Va. Code § 4-5-2.

[5] Informant Keene claimed there were major problems with the software that could be the result of incompetence, corruption, or both; that "the Sagitec folks are largely Indian;" that many are former Deloitte employees, and references to Massachusetts caused him concern that the software may have been stolen from Deloitte or Massachusetts. (May 17, 2016 Powers Memo at 1–2.) (Document 149-2.)

[6] Informant Keene testified that the thumb drive contained "probably several hundred documents" downloaded from SharePoint. (Keene Tr. at 26::3-4.) However, Investigator Powers' records indicate that the documents provided during the first meeting consisted of only two letters Informant Keene had written to a supervisor at WorkForce West Virginia, detailing concerns about Sagitec, and a data table from the Consortium.

Informant Keene and Investigator Powers communicated and met repeatedly, dozens of times, over the course of the investigation, and Informant Keene provided documents that he downloaded from SharePoint on numerous occasions. Informant Keene regularly shared his observations, speculation, and assessments regarding Sagitec, the Consortium Project, and the Maryland and West Virginia officials involved in the Consortium Project. On June 23, 2016, Informant Keene brought Investigator Powers a thumb drive and paper documents and participated in a meeting with Investigator Powers and other investigators. Investigator Powers' memo following the meeting recounts Informant Keene's assessment that Sagitec is "making up their own use cases" rather than using those created by business analysts, which he deemed a "bad idea," and that the "current Lead Manager [for the Consortium Project] is unqualified to do the job." (Powers Mem. June 23, 2026) (Document 363-6.) Informant Keene shared his belief that Sagitec was required to perform all work within the continental US[7] and speculated that work was done outside the country. He also opined that Sagitec was "in over their heads" and would not be able to do the work. *Id.*

On August 5, 2016, Investigator Powers arranged a conference call with several personnel at Deloitte, the purported victim, as well as Informant Keene. He recorded the call. Investigator Powers emphasized to Deloitte that Mr. Keene, who he did not identify, needed to maintain his anonymity to avoid repercussions from his superiors at WorkForce West Virginia, as well as noting the secrecy surrounding the investigation. Mr. Keene described his observations, explaining that he had seen documents with references to Massachusetts that caused him to believe that Sagitec had copied information from Deloitte. Mr. Keene and Scott Malm, a Deloitte employee with

[7] The unusual nature of a contract term permitting remote work but barring work from being performed in Hawaii or Alaska apparently did not raise red flags as to the accuracy of Informant Keene's information.

familiarity with Deloitte's unemployment insurance product, engaged in extended discussion of Sagitec's work, Mr. Keene's suspicions, and the type of information that would be useful to Deloitte in evaluating potential theft of intellectual property. For example, Mr. Malm stated: "what I would probably look to next if I had the ability to look into possible infringement would be whether or not there's a commonality or any indication in that installed codebase of any commonality with the Massachusetts system or any other ones that Deloitte has done, and then I would also be looking to the actual design documentation for similar references to Massachusetts…" (Deloitte Conference Call Tr., Aug. 5, 2016, at 25:58) (Document 363-6 at 23.) Informant Keene responded, "I don't know what I can produce that would help you compare it to the Massachusetts system. Is there something I should look for?" (*Id.* at 27:29) (Document 363-6 at 24.) Investigator Powers suggested that Mr. Malm and Mr. Keene "sit[] at the same computer together" to gain a better understanding. (*Id.* at 30:16) (Document 363-6 at 24.) The Deloitte representatives, including its attorneys, agreed that it would be improper for Deloitte personnel to view Sagitec's data or code, but the conversation continued with discussion of what material Informant Keene should try to obtain.[8]

In mid-September 2016, Informant Keene reported that he had been largely removed from working on the Consortium because Sagitec complained that he was unprofessional and slowing things down. Informant Keene retained access to SharePoint while he was removed from the Consortium Project, and he continued to regularly communicate with Investigator Powers. He continued to access SharePoint for purposes of the investigation, despite his lack of legitimate work responsibilities involving SharePoint during this period. Investigator Powers continued his

[8] Apparently, the Deloitte attorneys' concerns about ensuring they did not access material they lacked a legal basis to see did not prompt Mr. Powers to consider whether *he* had a legal basis to see Sagitec's files.

investigation with an interview with Maryland officials involved in the project, who agreed to provide documents that constituted official records. The Maryland officials, who were in a lead role for the Consortium, investigated Mr. Keene's allegations that Sagitec was using intellectual property stolen from Deloitte for the project, among other allegations. They spoke with Sagitec, as well as the Maryland Attorney General's office, and ultimately concluded that Mr. Keene's concerns were unfounded.

Investigator Powers' memos, as well as the testimony of both Mr. Powers and Mr. Keene, reflected a collaborative relationship between Mr. Powers and Mr. Keene. There were several instances in which Investigator Powers asked Informant Keene to look for something specific. For example, a September 29, 2017 memorandum indicates that Investigator Powers "asked the CI to search within the files accessible to him" for "document files for which the file properties indicated they may have originated with Deloitte." (Powers Mem., Sept. 29, 2017) (Document 363-6 at 71.)[9] Investigator Powers also asked Informant Keene to try to find out where servers and software associated with the Consortium Project were located, and Informant Keene attempted to do so. However, Mr. Keene and Mr. Powers also often discussed the investigation broadly and brainstormed about what material might implicate Sagitec in wrongdoing. Mr. Keene then looked for documents that would further the investigation based on those discussions. These searches into SharePoint conducted by Mr. Keene were unrelated to his job duties for WorkForce West Virginia. Investigator Powers cautioned Informant Keene on multiple occasions to ensure that

[9] Mr. Keene testified that he could not recall Mr. Powers ever instructing him or asking him to search for or download material from SharePoint. The Court found his testimony to lack credibility, particularly in light of the contemporaneous memoranda prepared by Mr. Powers that contradicted his testimony. Mr. Keene's demeanor and tone, as well as his memory, shifted sharply between direct and cross-examination. He indicated that he had participated in lengthy sessions with the United States prior to testifying, and he appeared to give answers he believed would be helpful to the United States regarding the motion to suppress, rather than simply providing truthful testimony to the best of his knowledge.

neither his superiors at WorkForce nor Sagitec find out that he was conducting the searches and downloading information to provide to Mr. Powers.

In the spring of 2017, Investigator Powers added a memo to his file detailing an interview that an Investigator with the Department of Labor and an attorney from the Department of Justice conducted with members of the United States Department of Labor involved with the Office of Unemployment Insurance, which issued grants for IT projects including the Maryland-West Virginia Consortium. (Powers Mem., April 13, 2017) (Document 363-6 at 50-51.) One of the Department of Labor officials stated that the grant funding for the project did not restrict the project from using employees from other countries.[10] (*Id.* at 52.) During that same time frame, Informant Keene continued to provide information about Sagitec to Investigator Powers. Also, during this time, Informant Keene's frustration with the Consortium Project was growing, and his discontent ultimately resulted in a formal written reprimand.[11]

Informant Keene returned to the Consortium team in or around September 2017. On December 19, 2017, Informant Keene called Investigator Powers to inform him that he had found a document on SharePoint with metadata showing that the author was Philip Tackett, who was a former Deloitte employee. (Powers Mem., Dec. 20, 2017) (Document 363-6 at 75.) Mr. Keene indicated that he had searched for other documents with Mr. Tackett's name and found approximately 278 such documents. Like his other searches, this search was entirely unrelated to Mr. Keene's job duties for WorkForce or his role working on the Consortium Project.

---

[10] Informant Keene's error regarding the contract requirements apparently did not impact Investigator Powers' assessment as to his reliability as an informant.

[11] Informant Keene was reprimanded for encouraging a coworker to circumvent the chain of command and to hold themselves out as officially representing WorkForce West Virginia in order to oppose any changes to the exit criteria that Sagitec was to comply with. (Document 150-2 at 62.) In the email, Informant Keene stated "[s]ometimes the urgency of action is more important than perfection of preparation." (Document 150-2 at 66.)

Investigator Powers asked him if he could download the documents without Sagitec knowing, then advised him to wait until he spoke with the attorneys. AUSA Cogar advised that Informant Keene should not download the files, but Mr. Keene had already done so when Mr. Powers reached him. On the advice of AUSA Cogar, Investigator Powers accepted the thumb drive but sealed it without immediately examining the contents.

In early August 2018, Mr. Keene requested and was granted access to the Sandbox, which contained the source code. Mr. Keene promptly downloaded the source code to a thumb drive, which he provided to Mr. Powers on August 7, 2018. (Powers Mem., Aug. 7, 2018) (Document 363-6 at 97.) Mr. Keene also shared various office rumors regarding personnel involved with the Consortium. The thumb drive containing source code and other material (including the material provided on December 20, 2017 and sealed) was provided to AUSA Cogar to be reviewed by a consultant. (Powers Mem. Oct. 5, 2018) (Document 363-6 at 101.) Although Mr. Keene claimed he used the source code for job-related testing, the Court found his testimony in that regard to lack credibility. During his testimony, he was unable to describe any testing he performed or the purpose of any such testing. He was also unaware of the programming language used for the source code and lacked knowledge or training in that programming language. Despite his confidence that he would have been able to figure out the programming language given enough time, the Court finds it unlikely that he was in a position to perform testing that aided WorkForce West Virginia.

In addition to the documents obtained from Informant Keene, Investigator Powers obtained material from other WorkForce employees after the investigation became overt in 2018. On July 18, 2018, Investigator Powers met Mark McNeely, a Programmer with WorkForce supervised by

Mr. Keene who worked on the Consortium Project, and Mr. McNeely described some of his technical concerns with the project. On November 8, 2018, Mr. McNeely provided Mr. Powers with a thumb drive that he "downloaded from the SharePoint site" and believed constituted the source code (which was in the Sandbox, rather than on SharePoint), and which Mr. Powers believed appeared to be the same material as that provided by Mr. Keene on August 7, 2018. (Powers Mem., Nov. 8, 2018) (Document 363-6 at 103.) Mr. Powers' memo indicates that Mr. McNeely had "not had time to conduct any analysis of the files he downloaded." (*Id.* at 104.) Mr. Powers testified that he had not asked Mr. McNeely to provide the source code, but conceded that after Mr. McNeely provided some use cases, he had asked Mr. McNeely to provide him with everything else he had, and Mr. McNeely later provided the thumb drive. (Supp. Hr'g Tr. at 114::12-19.)

In one instance, Investigator Powers successfully tracked down the origins of a use case containing Deloitte metadata that he obtained from a cooperating individual. Teresa Smith, a former WorkForce West Virginia employee who had been involved in the request for proposals and bidding process prior to Sagitec's selection as a vendor, testified that she and others had sought information from other states, including New Mexico. (Powers Mem. January 28, 2020) (Document 363-6 at 115.) Ms. Smith indicated that the document could have come from someone in New Mexico or could have come from the Technical Director at the National Association of State Workforce Agencies, who was involved with the Consortium Project from its inception. (*Id.*) She expressed certainty that she did not obtain the document from either Deloitte or Sagitec. (*Id.*)

Investigator Powers reached out to WorkForce officials in February and March 2022, seeking materials from the Consortium Project, including the source code.[12] The original indictment in this matter was returned in August 2022, and Mr. Powers' memos from this period reflect an effort to obtain new copies of material previously provided by Informant Keene. Jeffrey Green, the Deputy Executive Director of WorkForce, testified that WorkForce West Virginia was unlikely to have retained the source code, and explained that the Sagitec Framework is proprietary. However, he had instructed Jonathan Link to download use case documents, business rules, and document templates to salvage for potential use if West Virginia again attempted to develop a new system. Mr. Link provided a thumb drive with the material he had downloaded on March 29, 2022. Mr. Link testified that the documents he provided to Investigator Powers consisted of "use cases, test cases, and business process, documentation that West Virginia had previously provided." (Supp. Hr'g Tr. at 153::2-4) (Document 359 at 153.) He explained that the material was originally downloaded to ensure WorkForce would "have the data that we previously provided to the Consortium to develop a modernized unemployment system." (*Id.* at 154::4-5.) The material originating from Mr. Link did not include the source code, and Mr. Link had not personally reviewed the documents to search for intellectual property belonging to Deloitte or any other entity. (*Id.* at 165:22-166:1.)

Mr. Powers agreed that he likely documented more than 60 interactions with Mr. Keene during the course of the investigation. (Supp. Hr'g Tr. at 35:13) (Document 368.) Mr. Keene's report initiated the investigation, and Mr. Powers relied heavily on Mr. Keene throughout the investigation, both for access to documents and other materials and for technical knowledge.

[12] West Virginia exited the Consortium without completing or implementing the new software in 2019 after running out of funding.

From the very beginning of the investigation, Mr. Keene and Mr. Powers collaborated in the investigation, with lengthy discussions about which of Mr. Keene's assorted concerns could lead to criminal charges and how to further the investigation – discussions that Mr. Keene followed up by conducting targeted searches of Sagitec's collaborative workspaces.

Mr. Powers did not obtain a warrant prior to soliciting or accepting the material from Mr. Keene or the other WorkForce employees. He did not obtain a warrant prior to opening and reviewing the files. He did not have consent from Sagitec, Mr. Minkkinen, Mr. Sambasivam, or anyone else who controlled access to the virtual workspaces, and he did not obtain any material via a subpoena. In his testimony at the suppression hearing, Mr. Powers stated that the statute related to the West Virginia Commission on Special Investigations requires state and local government employees to cooperate with investigations, including by "gathering documents and records from entities of state and local government." (Supp. Hr'g Tr. at 6:21-7:5) (Document 368 at 6-7.) Therefore, Investigator Powers reasoned that he and Informant Keene were both acting in compliance with the statute when Informant Keene provided him with the Consortium documents. However, Investigator Powers, in conjunction with the U.S. Attorney's Office and the Department of Labor, chose to keep the investigation "covert," rather than officially requesting cooperation from WorkForce West Virginia, where such requests would and should have been handled by officials with greater access to the applicable records, greater knowledge of the contracting process with Sagitec, and access to agency attorneys who could advise on what material the agency had legal authority to disclose. (*Id.* at 44::5-16.)[13]

[13] Mr. Powers explained that when the investigation went overt, the Commission on Special Investigations sent a letter "to the Director of WorkForce West Virginia notifying them that there was an active investigation of Sagitec and the Consortium Project and requesting their full cooperation under Chapter 4." (Supp. Hr'g Tr. at 45::16-21.)

## DISCUSSION

The Defendants have moved[14] to suppress evidence that has been obtained through the warrantless searches conducted by Informant Keene and other non-Sagitec individuals that violated their Fourth Amendment rights. Specifically, the Defendants argue that Investigator Powers directed Informant Keene to search the private virtual workplaces of the Defendants and that the search was done without a warrant or applicable exception. They contend that their efforts to secure the SharePoint and Sandbox workspaces, combined with their roles within Sagitec and on the Consortium Project and their ownership interest in Sagitec, demonstrate a reasonable expectation of privacy in those spaces. They argue that "Informant Keene behaved as a government actor when he performed intrusive searches in the private workspaces of a private company," and emphasize that Investigator Powers knew of, acquiesced in, and sometimes directed, those searches. (Sambasivam Mem. at 13) (Document 150.) To the extent Sagitec authorized Informant Keene to access private workspaces, the Defendants argue that the consent was not voluntary because it was obtained through deception: the Defendants consented to permit access for purposes consistent with job duties at WorkForce West Virginia, not broad, unrelated searches in consultation with law enforcement. The Defendants argue that the law enforcement conduct in this case was particularly egregious: "Instead of using the investigatory procedures in place to ensure that evidence is reliable and to protect individual liberties, Investigator Powers chose to spy on Sagitec through a disgruntled government employee. Instead of requesting

[14] The Defendants did move separately, but Defendant Minkkinen's motion (Document 151) incorporates the same arguments offered by Defendant Sambasivam in his much lengthier motion (Document 150). Accordingly, the Court will consider both motions together.

information, he stole it." (Sambasivam Mem. at 24) (Document 150.) They seek exclusion of all evidence obtained as a result of the illegal searches, including the fruit of the poisonous tree.

The United States argues that the Defendants lacked a legitimate expectation of privacy in their collaborative virtual work environment. It emphasizes that "*none* of the data produced by CI Keene to the government came from any area or aspect of defendants Sambasivam's or Minkkinen's personal lives, wherein a reasonable person would expect privacy," and neither Defendant had an expectation of privacy in those specific items produced by CI Keene. (U.S. Resp. at 7) (Document 158.) It argues that the "Consortium Project belonged to the Consortium," Sagitec's data belonged to the company, and the Defendants cannot assert any Fourth Amendment rights that belong to the Consortium or Sagitec. (*Id.* at 8.) The United States also contends that "CI Keene accessed the Sandbox[15] and other environments with express authorization in furtherance of his position with WorkForce WV." (*Id.*) Because the data in the shared workspaces was disclosed to members of the Consortium, the United States argues that the Defendants had no right to privacy in those materials and spaces. It contends that the trade secret data was treated lawfully by Mr. Keene and investigators. The United States further argues that Mr. Keene was not acting as an agent of law enforcement, but instead that his accessing the materials was reasonable given his role and the concerns he expressed.

*A. Reasonable Expectation of Privacy*

The Fourth Amendment of the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

[15] The United States' response refers to the virtual workspaces, including both SharePoint and the Sandbox, as the "Sandbox," and therefore misstates the timeline on which Mr. Keene gained access to the Sandbox and the source code.

seizures." The Supreme Court has explained that "[t]he basic purpose of this Amendment…is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (quoting *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 528 (1967). The ultimate question in determining whether a place searched is protected by the Fourth Amendment is "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). That expectation of privacy must be one that society is prepared to recognize as 'reasonable.' *Katz v. U.S.*, 389 U.S. 347, 361 (1967). A person bringing a Fourth Amendment challenge to a search has the burden of establishing a "legitimate expectation of privacy in the area searched," which requires that the individual has a subjective expectation of privacy that is objectively reasonable. *United States v. Castellanos*, 716 F.3d 828, 832 (4th Cir. 2013).

"When an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Carpenter v. United States*, 585 U.S. 296, 304 (2018) (internal quotation marks omitted). However, Fourth Amendment claims do not "rise or fall with the *Katz* formulation," but can also be based on property rights, and "for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates." *United States v. Jones*, 565 U.S. 400, 406 (2012) (explaining that the recognition that privacy rights may exist absent a violation of an individual's property rights did not diminish common-law trespass as a basis for finding a Fourth Amendment violation, where

officers attached a GPS device to a vehicle). In summing up the core principles underlying Fourth Amendment precedent, the Supreme Court recently stated:

> From the founding onward, we have explained, the Fourth Amendment has sought to secure the privacies of life against the exercise of arbitrary power. So too we have recognized, and repeatedly, that the Amendment was designed to place obstacles in the way of a too permeating police surveillance. Whatever the form of an attempted incursion, the Fourth Amendment protects Americans' long-held conviction that no government official should have free access to the most closely kept aspects of their lives.

*Chatrie v. United States*, 146 S. Ct. 2193 (2026) (internal punctuation and citations omitted).

Workplaces are not excluded from the protections of the Fourth Amendment. In a civil case challenging a search of patient records in a methadone clinic, the Fourth Circuit held that "[i]n August 1998, clearly established Fourth Amendment principles prohibited officers from searching private areas within commercial or business premises, or even private areas within public places, without probable cause." *Doe v. Broderick*, 225 F.3d 440, 455 (4th Cir. 2000). The Fourth Circuit noted "a distinction between searches conducted by public employers on work-related matters and searches conducted by law enforcement officials for evidence of a crime," with probable cause required for the latter. *Id.* at 454. "[T]he Supreme Court has determined that a search of desk drawers and locked file cabinets located in a workplace is almost always unreasonable if it fails to conform to the warrant requirement." *Id.* at 453. Decades earlier, the Supreme Court found that a union official had a reasonable privacy interest in papers taken from a shared office used by several union officials and "had Fourth Amendment standing to object to the admission of the papers at his trial." *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968). The Supreme Court reasoned that the official "could reasonably have expected that only those persons

[who shared the office] and their personal or business guests would enter the office, and that records would not be touched except with their permission of that of union higher-ups." *Id.*

Mr. Minkkinen and Mr. Sambasivam, through their roles as Sagitec owners and executives, and through their lead management roles on the Consortium, controlled access to the virtual workspaces involved in the Consortium Project, including SharePoint and the Sandbox. The data contained therein constitutes their "papers" and "effects" for Fourth Amendment purposes. *See, Chatrie v. United States*, 146 S. Ct. 2193, 2220 (2026) (Gorsuch, J. concurring) (explaining that the "traditional approach" of focusing on whether the Government has searched an individual's person, house, papers, or effects "remains very much part of our law"); *United States v. Jones*, 565 U.S. 400, 406 (2012). Even the United States does not suggest those spaces were public. Indeed, such an argument would run counter to its allegations that the Defendants believed material in those spaces constituted Deloitte's trade secrets. Instead, it suggests that the lack of *personal* material within the SharePoint or Sandbox environments negates any expectation of privacy and Fourth Amendment protection. However, the United States cites no authority for the proposition that the Fourth Amendment offers no protection against warrantless searches of confidential business records.

The Defendants' behavior, as well as the context surrounding the data at issue, support a finding that they had a subjective expectation of privacy in the virtual workspaces. They established systems that tightly restricted access to a limited number of individually approved people with work duties relevant to the Consortium Project. Access required a username and password, individually generated by Sagitec after approval by Mr. Sambasivam or someone to whom he delegated that authority. That access could be tailored to the user's role. Users logged

in via a VPN. Sagitec (and as substantial owners of Sagitec, the Defendants)[16] owned the Microsoft Azure licenses for the software that hosted the SharePoint and Sandbox workspaces. Even within Sagitec, only employees who needed access to work on the Consortium Project were granted credentials for access. The Defendants worked in the virtual workspaces on a regular basis for years surrounding the contested searches. Given their ownership interest in Sagitec, their roles on the Consortium Project and at Sagitec, and the systems they established to limit access to the virtual workspaces at issue, the Court finds both that the Defendants had a subjective expectation of privacy and that their expectation of privacy was objectively reasonable. Just as employees have a reasonable expectation of privacy in their offices, the Defendants had a reasonable expectation of privacy in their virtual workspaces. *See, e.g.*, *O'Connor v. Ortega*, 480 U.S. 709, 716 (1987) ("Within the workplace context, this Court has recognized that employees may have a reasonable expectation of privacy against intrusions by police.")

The United States relies in part on the third-party doctrine, suggesting that the Defendants surrendered any privacy interest by inviting WorkForce West Virginia into the virtual workspaces. The facts here, however, are quite distinct from *United States v. Miller*, 425 U.S. 435 (1976) or *Smith v. Maryland*, 442 U.S. 735 (1979). In *Miller*, law enforcement subpoenaed a customer's records from a bank, and the Supreme Court found that the depositor had no reasonable expectation of privacy, in part because he could "assert neither ownership nor possession" of the bank records and in part because the records "contain only information voluntarily conveyed to the banks and

[16] The United States suggests that only Sagitec has standing to challenge a search of its virtual workspaces. Corporations can act only through their employees, and employees acting on behalf of a corporate employer (and potentially being investigated for crimes committed in relation to their employment) are not left entirely without Fourth Amendment protection. The implications of the United States' position are quite troubling. It would essentially permit the Government to conduct warrantless searches of the premises, papers, and effects of corporations or other businesses so long as investigators focus any criminal investigation on individual employees, rather than the corporate entity itself.

exposed to their employees in the ordinary course of business." *United States v. Miller*, 425 U.S. 435, 440-42 (1976) (also noting that the records were presumed by Congress to be subject to disclosure in the Bank Secrecy Act). In *Smith*, law enforcement installed a pen register "on telephone company property at the telephone company's central offices," and the Supreme Court found that the petitioner lacked a legitimate expectation of privacy in "the numbers he dialed on his phone." *Smith v. Maryland*, 442 U.S. 735, 741-42 (1979).

In this case, in contrast, the type of material stands in stark contrast to the minimally revealing transactional records in *Miller* and *Smith*. The United States believes the type of data at issue here to be sufficiently private and subject to sufficient legal protection that the Defendants' alleged theft of it warrants criminal prosecution for conspiracy to steal trade secrets.[17] Unlike the bank records in *Miller*, which a statute recognized as subject to disclosure, source code, documents, and records owned by a corporation are potentially subject to legal protection against public disclosure. Furthermore, the Defendants and their company remained in possession and control of the virtual workspaces throughout the project.[18] And Investigator Powers did not obtain the records from the third-party entity the Defendants contracted with, WorkForce West Virginia, but from an individual employee who concealed his searches from both WorkForce and Sagitec. When Investigator Powers requested the records through official channels, WorkForce was unable to provide them. The Court need not consider a hypothetical case in which Investigator Powers made an official request to WorkForce West Virginia, and WorkForce

---

[17] The United States has emphasized that the conspiracy charge in the Superseding Indictment turns on the Defendants' beliefs about the proprietary nature and trade secret status of the material, further establishing that they would have had an expectation of privacy.

[18] As Deloitte's attorney pointed out at the beginning of this investigation, "we don't have a right to see Sagitec's things." (Deloitte Conference Call Tr., Aug. 5, 2016, at 31:16) (Document 363-6 at 25.) The access provided to WorkForce West Virginia employees is more akin to a homeowner inviting guests to a gathering than a customer seeking to control access to records generated by a business he utilizes.

provided these materials, because Investigator Powers chose to keep his investigation "covert."[19] Thus, the Court finds the third-party doctrine inapplicable. While sharing access with clients, including WorkForce West Virginia, may have "reduced [the Defendants'] expectation of privacy to some degree," that does not entirely eliminate Fourth Amendment protection or "negate [the] reasonable expectation of privacy against the government." *United States v. Lowers*, 170 F.4th 134, 145 (4th Cir. 2026). The Court finds that the Defendants have met their burden of establishing that they had a reasonable expectation of privacy in the virtual workspaces, including SharePoint and the Sandbox, where they controlled access, stored work product, and spent a substantial portion of their workdays.

*B. Informant Keene's Role*

The searches in this case were conducted initially by Informant Keene, not by Investigator Powers or any other law enforcement officer. "Although the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative, the Amendment protects against such intrusions if the private party acted as an instrument or agent of the Government." *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 614 (1989). "Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances." *Id*. at 614-15 (internal citations and quotation marks omitted). "The burden of proving that a private party acted as an agent or instrument of the government is on the defendant." *United States v. Ellyson*, 326

[19] It is worth noting, however, that when Investigator Powers did make official requests, agencies provided only materials that constituted public records, not the (potentially proprietary) data owned by Sagitec and controlled by the Defendants.

F.3d 522, 527 (4th Cir. 2003). The Fourth Circuit recently addressed third-party access in the context of a Google account, wherein Google's privacy policy permitted it to analyze content for spam, malware, and illegal content. *United States v. Lowers*, 170 F.4th 134, 145 (4th Cir. 2026). The court explained that "a user's knowledge that Google might occasionally sift through their files does not mean that he expects the Government to have equally unfettered access to those same files." *Id.* at 146 (comparing the Google drive to a hotel room or rented apartment, wherein a landlord or housekeeper may observe contraband and report it to police, but police cannot enter without a warrant, even with consent from the landlord).

Courts consider "two primary factors" to determine whether a search by a private person constitutes a government search: "(1) whether the Government knew of and acquiesced in the private search; and (2) whether the private individual intended to assist law enforcement or had some other independent motivation." *United States v. Jarrett*, 338 F.3d 339, 344 (4th Cir. 2003). However, "simple acquiescence by the Government does not suffice to transform a private search into a Government search. Rather, there must be some evidence of Government participation in or affirmative encouragement of the private search before a court will hold it unconstitutional. Passive acceptance by the Government is not enough." *Id.* at 345-46.

In *Ellyson*, the Fourth Circuit found that the district court had not clearly erred in concluding that a woman who shared a residence with Ellyson, criminal defendant, was not acting as a government agent when she found computer disks containing incriminating evidence and turned them over to police. *Ellyson*, 326 F.3d at 528. After Ellyson was arrested, officers told her she could be charged with aiding and abetting if there was anything illegal in the house and she failed to turn it in. *Id.*at 525. She visited Ellyson in jail, unprompted by officers, and he

asked her to dispose of the computer disks. *Id.* She instead turned them over to police. *Id.* The district court found that she was motivated by concern that she could be held responsible for the contraband, rather than a desire to aid law enforcement, and was not acting as an agent. *Id.* at 528. Although the Fourth Circuit concurred with Ellyson that the evidence "might have allowed a different conclusion," it deferred to the district court's factual findings. *Id.*

In *Jarrett*, an anonymous hacker forwarded evidence of child pornography to the FBI and law enforcement agents in July 2000, and an agent sent emails thanking him for his assistance, updating him on the trial, assuring him that he would not be prosecuted for hacking, and indicating that the officer would be available if the hacker wished to provide other information. *Jarrett*, 338 F.3d at 341. Months later, the hacker emailed an Alabama officer about a potential child molester from Virginia, William Jarrett. *Id.* at 342. The officer responded that the FBI would prefer the hacker send the information to the Alabama officer. *Id.* The hacker sent a series of emails with attached evidence, and the FBI obtained a search warrant and arrested Jarrett. *Id.* The hacker soon began communicating with an FBI agent involved in the case, and she sent an email explaining that she could not ask him to search out similar cases because it would make him an agent of the government and render his searches illegal but inviting him to feel free to send such images. *Id.* at 343. The Fourth Circuit found that the final email from the FBI agent likely created an agency relationship, but that such a relationship was not retroactive, and the perfunctory communications prior to the search were insufficient. *Id.* at 346-47. The court explained:

> At the end of the day, in order to bring Unknownuser [the hacker] within the grasp of an agency relationship, Jarrett would have to show that the Government made more explicit representations and assurances (as in the post-hoc Faulkner emails) that it was interested in furthering its relationship with Unknownuser and availing itself of the fruits of any information that Unknownuser obtained.

> Although evidence of such "encouragement" would not have to target a particular individual, it would have to signal affirmatively that the Government would be a ready and willing participant in an illegal search.

*Id*. at 347.

Investigator Powers undoubtedly knew of and acquiesced in Informant Keene's searches, with the possible exception of the very first meeting in June 2016, wherein Informant Keene provided three documents, two of which he had drafted himself to detail his concerns. Although their prior relationship and interactions in previous investigations may point to an ongoing agency relationship, the Defendants did not introduce sufficient evidence to establish an agency relationship prior to the first meeting regarding Sagitec and the Consortium.[20] From the time of that meeting, however, Investigator Powers treated Informant Keene as a collaborator, essentially as part of the investigative team. Informant Keene searched for information based on their discussions about what crimes Sagitec and its employees might be committing and what information might be useful. Early in the investigation, Informant Keene was a key participant in a call that Investigator Powers arranged with personnel, including attorneys and the Workforce and Employment Lead at Deloitte. An informant who participates in a call with the purported victim, facilitated by law enforcement, and engages in a technical discussion about what to search for amongst Sagitec's files is no longer acting as a private party, but as a government agent.

Mr. Keene continued to search SharePoint for material that would further the investigation, based on both his frequent detailed discussions with Mr. Powers about the investigation and on direct requests from Mr. Powers. The searches were unrelated to his job duties. He continued

[20] In the first phone call on May 17, 2016, Investigator Powers recounts telling Mr. Keene to "keep as close tabs on this as he can." (Powers Mem., May 17, 2016) (Document 363-6 at 6.) Even if that is not sufficient to immediately establish the necessary level of affirmative encouragement, the pattern of interactions quickly rose to that level.

conducting such searches and providing information to Investigator Powers even after he was no longer working on the Consortium Project. When Mr. Keene gained access to the Sandbox, he immediately downloaded the source code and provided it to Investigator Powers. Mr. Powers' acceptance was hardly surprising, given that he had accepted hundreds of previous documents from Mr. Keene and had discussed how useful the source code would be if and when Mr. Keene obtained access. Mr. Keene's actions demonstrate that his primary purpose in gaining access to the Sandbox was to provide the source code to Mr. Powers. In addition, his lack of knowledge about the source code, including the programming language it was in, and his inability to describe any work-related actions he took with it, confirm that he used his role as a programmer at WorkForce as cover for his role as an investigator assisting Mr. Powers—a role in which Investigator Powers encouraged him.

Mr. Keene's sole motivation in searching metadata for mentions of Deloitte, searching for references to Massachusetts, searching for documents authored by Philip Tackett, conducting other similar searches, and downloading the source code was to assist law enforcement. He explained that he believed he was free to share Sagitec's proprietary information with third parties "if it was law enforcement." (Supp. Hr'g Tr. 65::19-21) (Document 359.) While the Court found much of Mr. Keene's testimony less than credible, it was clear that he believed Sagitec was engaged in wrongdoing, and he wanted to help law enforcement build a case against Sagitec and/or its employees.

In short, the evidence that Informant Keene was acting as an agent of law enforcement was overwhelming. He met with Mr. Powers dozens of times, provided reams of data downloaded from workspaces controlled by the Defendants, and the specific information and data he provided

was directed by Mr. Powers, either through direct requests or through collaborative discussions about the needs of the investigation.

To the extent others at WorkForce, including Mr. Keene's subordinate, Mark McNeely, provided information from SharePoint or the Sandbox to investigators, they likewise intended to assist law enforcement and had no other motivation. Mr. McNeely, like Mr. Keene, conducted searches after Mr. Powers asked for his assistance in accessing documents. While he did not have the same long-standing and collaborative relationship, the Court finds that the fact that he was supervised by Mr. Keene, in combination with Mr. Powers' request for any additional documents he could find, was sufficient to make Mr. McNeely a government agent when he turned over Sagitec's data.

*C. Scope of Searches*

Even if the Court were to find that Keene was not an agent of the Government, despite the staggering weight of the evidence that he was, the United States would not be in the clear. When the Government receives items from a private search, it "may not exceed the scope of the private search unless it has the right to make an independent search." *Walter v. United States*, 447 U.S. 649, 657 (1980) (finding that viewing films exceeded the scope of a search by a private party, where the private party observed labels describing potentially unlawful content). "Digital files are containers," and "police must still get a warrant before they can open the container and confirm its contents." *United States v. Lowers*, 170 F.4th 134, 149 (4th Cir. 2026).

Investigator Powers did not seek a warrant at any point. Nor did the United States seek a warrant prior to collecting much of the data provided by Informant Keene and delivering it to a consultant for review. The United States has the burden of establishing that the Defendants'

"expectation of privacy had been frustrated," by a private party's prior viewing of the material. *Id.* at 153. Given the amount of material Mr. Keene provided, it is unlikely that he personally viewed the documents. There is no evidence that he personally viewed the documents. Instead, he conducted searches for documents responsive to a search term, downloaded all of those documents, and provided the collected documents to Investigator Powers. In the case of the source code, similarly, Mr. Keene noted the massive size of the program. He downloaded it and provided it to Mr. Powers without meaningful review. Mr. McNeely did the same. The use cases or other material eventually supplied by Jonathan Link following an official request to WorkForce management were likewise never reviewed by Mr. Link or other private parties. According to the testimony, Mr. Link and Mr. Green believed the material consisted only of documents originally created by West Virginia. To the extent the files provided included documents originating with Sagitec, Deloitte, or the Defendants, no third party had privately searched those documents to defeat the Defendants' privacy interest. The United States certainly has not provided evidence that the individuals who provided the material to investigators reviewed those documents or that the scope of any private party search was consistent with the scope of the subsequent search by law enforcement. Thus, the thumb drives, email attachments, and other means of transferring material obtained by Investigator Powers from Mr. Keene, Mr. McNeely, and Mr. Link all constitute containers that could not legally be searched without a warrant.

*D. Suppression*

In sum, the Defendants had a reasonable expectation of privacy in the virtual workspaces that they and their company owned and controlled. Those workspaces contained confidential material and access was tightly controlled. Providing access to employees of the Consortium

states for tasks associated with the Consortium Project did not eliminate all expectation of privacy against intrusion by law enforcement. Informant Keene acted as an agent of law enforcement, not as a private party, when he searched the Sagitec workspaces. Investigator Powers and others then opened files provided by Mr. Keene without first obtaining a warrant, again violating the Constitutional prohibition on unreasonable warrantless searches. The searches were illegal when Mr. Keene undertook them with the encouragement of Mr. Powers, the searches were illegal when Mr. Powers opened the files, and the searches were illegal when the United States shared the files with experts and others to build this case.

Investigator Powers' actions are frankly baffling, particularly in light of his ongoing consultation with AUSA Cogar during the investigation. Mr. Powers testified that he had a 24-year career with the West Virginia State Police prior to joining the Commission on Special Investigations. That experience would have provided him with at least some minimal awareness of Fourth Amendment implications. The Court has presided over criminal prosecutions, in both state and federal court, arising from a wide variety of criminal investigations. When a case begins with a tip from a confidential informant, law enforcement *routinely* uses that information, in combination with information obtained from public records, interviews, and plain-view observations, to develop probable cause and seek a search warrant. The Court has never seen a case in which law enforcement spent *years* on a document-intensive investigation, apparently without ever considering attempting to obtain evidence via a search warrant, subpoena, or other legal process. The Court will not speculate as to whether that is because most law enforcement officers are more adept with the Fourth Amendment or because prosecutors normally screen cases with such glaring Fourth Amendment problems.

The Assistant United States Attorneys involved in this case apparently periodically recognized the problem with building a case on evidence obtained through the warrantless searches of an informant conducted in consultation with law enforcement. AUSA Cogar, when asked whether Mr. Keene should turn over evidence from a proposed search, said he should not. But he later accepted that evidence without a warrant to share with a consultant in order to pursue the case. After West Virginia had withdrawn from the Consortium with no final product, investigators went through official channels to inquire about the availability of use cases and source code, presumably seeking copies from another source to supplement or replace the versions previously provided by Mr. Keene. But again, when those efforts were unavailing, the attorneys moved forward and presented Mr. Keene's evidence to the grand jury, and they now seek to use it at trial.

This scenario is precisely what the exclusionary rule is designed to address: willful, inexplicable, repeated violations of the Defendants' constitutional right to be free of unreasonable searches and seizures. The exclusionary rule is "a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 229–32 (2011). "The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations." *Id.* at 236-37. Thus, it is not applied when law enforcement acted in good faith, but "the deterrent value of exclusion is strong and tends to outweigh the resulting costs" when the law enforcement conduct was in deliberate, reckless, or grossly negligent disregard of the Fourth Amendment. *Id.* at 238. The law enforcement conduct here was particularly culpable. Investigator Powers continued to encourage Informant Keene to conduct searches and provide him with the Defendants' papers and effects despite Deloitte's

attorney, then AUSA Cogar, bringing up the lack of legal authority for obtaining those items, and the conduct continued for a period of years. Investigator Powers' only proffered justification was that he believed the statute establishing the Commission on Special Investigations required cooperation from state agencies.[21] Nothing in that statute can reasonably be read to permit a state employee to provide proprietary data owned by a contractor directly to an investigator for the Commission. Even if Mr. Powers fairly interpreted the statute, a state statute cannot diminish the Fourth Amendment or allow for sidestepping its protections. Under the facts presented, the Court finds that the Defendants have met their burden, the motions to suppress should be granted, and evidence obtained in violation of the Defendants' Fourth Amendment rights and its fruits should be excluded.[22]

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that *Defendant Sivaraman Sambasivam's Motion to Suppress Evidence Obtained by West Virginia Commission on Special Investigations Through Illegal Searches Using Confidential Informant* (Document 150) and *Defendant David Minkkinen's Motion to Suppress Evidence Obtained by West Virginia Commission on Special Investigations Investigator Jim Powers Through Confidential Informant Greg Keene* (Document 151) be **GRANTED**.

[21] West Virginia Code § 4-5-2(b)(7) provides that the Commission may "Interview witnesses and require production from any entity of state government, or of any political subdivision of the state, of books, records, documents, papers, computers, laptops, computer hard drives, electronic records…" except where such data or items "are protected from disclosure by state or federal law or privilege recognized by state or federal courts." W. Va. Code § 4-5-2(b)(7). Such requests for production "may be in the form of a written letter from the direction of the commission in lieu of a subpoena." *Id.*

[22] In granting the motions to suppress, the Court does not adopt any particular Bates numbers as the Court has no identifying information regarding particular Bates numbers but is confident that Counsel will be guided on the purview of the opinion given the ruling and discussion herein.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendants and their respective counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER: October 7, 2026

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA